13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BEST MEDICAL INTERNATIONAL, INC., )
                               )
          Plaintiff,       )
                               ) C.A. No. 18-1599(MN)
v.                             )
                               )
VARIAN MEDICAL SYSTEMS, et al.,   )
                               )
          Defendants.       )

Friday, June 26, 2020
10:00 a.m.
Teleconference

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge

APPEARANCES:

          YOUNG CONAWAY STARGATT & TAYLOR
          BY:  ANNE SHEA GAZA, ESQ.

          -and-

          MADDOX EDWARDS, PLLC
          BY:  STEVEN A. MADDOX  ESQ.
          BY:  JEREMY J. EDWARDS, ESQ.
          BY:  ANTHONY H. SON, ESQ.

                  Counsel for the Plaintiff

```
 1    APPEARANCES CONTINUED:

 2

 3

 4            SHAW KELLER LLP
              BY:  JOHN W. SHAW, ESQ.
 5            BY:  DAVID M. FRY, ESQ.

 6            -and-

 7            KEKER VAN  NEST & PETERS
              BY:  LEO LAM, ESQ.
 8            BY:  JULIA ALLEN, ESQ.
              BY:  JOSE MARTINEZ, ESQ.
 9            BY:  RYAN WONG, ESQ.

10                   Counsel for the Defendants

11

12

13            _ _ _ _ _ _ _ _ _

14
```

09:39:58 14

09:56:00 15   THE COURT:  Good morning, counsel.  Who is

10:02:15 16   there, please?

10:02:17 17   MS. GAZA:  Good morning, Your Honor.  It's Anne

10:02:20 18   Gaza from Young, Conaway on behalf of Best Medical.  Would

10:02:24 19   you like me to introduce my colleagues on the phone on

10:02:27 20   behalf of Best?

10:02:28 21   THE COURT:  Yes, please.

10:02:29 22   MS. GAZA:  Thank you, Your Honor.  I'm joined

10:02:31 23   today by Anthony Son, Jeremy Edwards and Steven Maddox of

10:02:37 24   the Maddox Edwards firm.  We're also fortunate to be joined

10:02:42 25   by telephone, Your Honor, by James Brady, chief litigation

10:02:45 1    counsel for Best, John Brosky, chief patent counsel for

10:02:51 2    Best, and JanPaul Guzman, U.S. corporate and IP counsel for

10:02:56 3    Best.

10:02:57 4              Thank you.

10:02:57 5              THE COURT:  Thank you.  Welcome to you all.

10:02:59 6              For the Defendants?

10:03:02 7              MR. FRY:  Good morning, Your Honor.  This is

10:03:03 8    David Fry from Shaw Keller on behalf of Varian.  With me on

10:03:07 9    the line from my office today is John Shaw.  From Keker, Van

10:03:11 10   Nest & Peters, we have Leo Lam and Ryan Wong, who will be

10:03:14 11   arguing claim construction, Julia Allen, who will be arguing

10:03:18 12   the motion to stay, and Jose Martinez, who will be arguing

10:03:22 13   the motion to dismiss.  We also have Joseph Brecker as well

10:03:28 14   as Reeta Whitney from Varian.

10:03:29 15             THE COURT:  Welcome to all of you as well.

10:03:33 16             We are here today for arguments on the disputed

10:03:37 17   claim terms, the motion to dismiss, and probably the motion

10:03:40 18   to stay depending on how my finding works.  I note that we

10:03:44 19   started with ten disputed terms and that the parties worked

10:03:47 20   together to narrow the disputes to five terms.  And I wanted

10:03:52 21   to start by saying thank you.  We appreciate that effort.

10:03:57 22             Now, we're doing this by phone today and that

10:04:00 23   presents a few challenges, but I'm sure that we can make it

10:04:04 24   work.  I see on the Zoom presentation that the slides are

10:04:06 25   probably going to be put up in front of me.  I will say in

10:04:15 1    addition that I have the slides submitted by each party in

10:04:19 2    front of me.  And that even if you're doing it on the Zoom

10:04:23 3    presentation, it's helpful to me if you identify the slides

10:04:26 4    by number.

10:04:28 5           I also have the patents and the joint appendix

10:04:31 6    and the supplemental joint appendixes in front of me and I

10:04:36 7    ask if you refer me to something in those, you give me a

10:04:40 8    chance to get to the correct page.  Those are voluminous

10:04:44 9    documents and it may take me a few minutes to get to the

10:04:47 10    right place and I want to be looking at the right pages so

10:04:51 11    that I can follow your arguments.

10:04:52 12           I will ask that each time you start to speak

10:04:55 13    after another person has spoken that you identify yourself.

10:04:58 14    My court reporter, Dale Hawkins, is also remote and if you

10:05:03 15    identify yourself it will help us to have a clear record.

10:05:06 16           And finally, one of the challenges of doing this

10:05:10 17    remotely is it's harder for me to ask questions.  There is

10:05:14 18    often a delay when I start talking and the attorneys just

10:05:17 19    keep talking until I say wait, wait a few times because the

10:05:20 20    system doesn't click over immediately and let them hear that

10:05:24 21    I'm asking a question.  So I'll just ask you to be mindful

10:05:27 22    to listen for questions or maybe if you stop every once in a

10:05:31 23    while to see if I have any, that would be helpful.

10:05:35 24           Finally, I want to remind everyone on the phone

10:05:35 25    that the recording or broadcasting of these proceedings is

10:05:45  1    prohibited.

10:05:45  2              Are there any questions before we begin?

10:05:48  3              MS. GAZA:  No, Your Honor.  Thank-you.

10:05:50  4              THE COURT:  Then let's start.  I would like to

10:05:53  5    go term by term and I'm fine taking them in the order

10:05:56  6    proposed by the parties in the amended claim chart submitted

10:05:59  7    last Friday.

10:06:00  8              I will hear from the Plaintiff first.

10:06:03  9              MR. EDWARDS:  Thank you and good morning, Your

10:06:05 10    Honor.  This is Jeremy Edwards.  Can you see my slides, Your

10:06:10 11    Honor?

10:06:11 12              THE COURT:  I can.  I can see a cover page that

10:06:14 13    says Markman hearing, June 26th.

10:06:16 14              MR. EDWARDS:  Excellent.

10:06:18 15              I'm going to be going through these slides

10:06:21 16    today.  The slide numbers are the same as what Your Honor

10:06:25 17    has, but I may be taking some of them out of order.  But if

10:06:28 18    you are looking at the slide number in the bottom right

10:06:31 19    corner, that will be the same number that appears perhaps in

10:06:35 20    a different location in terms of the order in the set that

10:06:40 21    you have.

10:06:41 22              THE COURT:  Okay.

10:06:42 23              MR. EDWARDS:  We did a little bit of

10:06:44 24    streamlining last night.  The slides are all the same, it's

10:06:48 25    just I might take them in a different order.

10:06:50  1          THE COURT:  Okay.

10:06:50  2          MR. EDWARDS:  So with that, let me try to get my

10:06:53  3  screen the way I need it to be.  So I'll be handling the

10:07:01  4  Markman portion today for Plaintiffs.  Just a brief note.

10:07:05  5  I'm sure Your Honor is familiar with the patents and the

10:07:08  6  background of the technology from the tutorials and so

10:07:13  7  forth, so I don't wish to belabor that, we are tight on time

10:07:16  8  but I do want to give just a brief overview about the

10:07:19  9  patents and the claims that we are -- the claim terms that

10:07:22 10  are in dispute.

10:07:23 11          So very briefly, there are four patents-in-suit.

10:07:27 12  The first two, the '283 and '096, share somewhat of an

10:07:33 13  overlapping disclosure, and the other two are the '096 and

10:07:41 14  '490, they do not share any overlapping disclosure, although

10:07:45 15  some other patents are incorporated by reference in those.

10:07:48 16  And we'll get into where that matters.  The first two

10:07:51 17  patents, the '283 and '096, the parties have agreed where

10:07:55 18  the terms show up in both, they should be construed the

10:07:59 19  same, so we'll be lumping those together.  And the set of

10:08:02 20  terms in dispute for that pair of patents on the next slide

10:08:07 21  you'll see is what we can loosely refer to as the computer

10:08:11 22  terms.  And these terms show up both in apparatus claims and

10:08:15 23  in method claims of the '283 and '096 Patents, and there is

10:08:21 24  different permutations on these, but fundamentally the

10:08:25 25  dispute here boils down to whether these computer terms are

10:08:30 1    subject to means-plus-function construction, or

10:08:34 2    step-plus-function construction as the case may be under the

10:08:39 3    governing statute, 35 U.S.C., Section 112(6).

10:08:45 4              THE COURT:  You don't have to tell me this

10:08:48 5    stuff.  That was really clear from the brief.  Let me

10:08:51 6    promise you, we have read the brief and the patents

10:08:53 7    carefully.  So given that we're limited on time, why don't

10:08:57 8    you just get to the heart of the argument.

10:09:01 9              MR. EDWARDS:  Fair enough.  Will do.

10:09:03 10             I do think there needs to be some clarifications

10:09:05 11   about the legal standards and some amplifications.  If you

10:09:09 12   look at slide 111, I think it's clear that the Federal

10:09:14 13   Circuit has provided a fair amount of guidance in this.  The

10:09:17 14   Williamson case, which you'll hear a lot about today, set

10:09:22 15   that forth.  In the first bullet point, you can see the

10:09:25 16   standard, I'm not going to recite it, but it really relates

10:09:29 17   to whether the claim term "computer" relates sufficiently

10:09:33 18   definite structure and it's the name for structure.

10:09:36 19             Your Honor, I'm sure is aware that there is a

10:09:40 20   presumption that applies in this case against application of

10:09:44 21   112(6) because the claims don't recite means for or step

10:09:48 22   for, the sort of magic language.  The burden to overcome

10:09:53 23   that language rest with Varian and their burden to show by a

10:09:57 24   preponderance of the evidence that 112(6) does not apply to

10:10:01 25   these claims.  That presumption can be overcome if they show

10:10:04  1   that the claim term fails to recite definite structure on or

10:10:08  2   fails to recite sufficient structure that is with the

10:10:14  3   function.  The case law has developed what it takes to

10:10:20  4   recite sufficient structure.  And I would submit to Your

10:10:25  5   Honor that the answer from the case law is that it doesn't

10:10:28  6   take much.

10:10:30  7          If you take a look at the *Watts* case from the

10:10:33  8   Federal Circuit, their court there explained that the claim

10:10:38  9   limitation does not need to connote a precise physical

10:10:41 10   structure.  And the guidance from the *Lighting World* case,

10:10:44 11   the Federal Circuit case from 2004, is really interesting

10:10:47 12   and I think helps frame the issue here.  There, they cited

10:10:51 13   sufficient that the claim term is used in common parlance,

10:10:55 14   or by person of skill in the art to designate structure.

10:11:00 15   And even more interesting they said that's true even if the

10:11:03 16   term covers a broad class of structures.  And it's still

10:11:07 17   true even if the term identifies the structure by its

10:11:10 18   function.

10:11:13 19          We've heard a fair amount from Varian about how

10:11:16 20   "computer" is something of a nonce word and that a computer

10:11:22 21   is something that computes.  But the guidance from the

10:11:25 22   *Lighting World* case says that's not the end of the analysis

10:11:28 23   here, and it's not enough to simply say that a computer

10:11:34 24   computes and therefore it's some sort of nonce word.  I'll

10:11:38 25   note that the *Lighting World* guidance is still good law even

10:11:42  1   after the *Williamson* decision.  You're going to hear a lot

10:11:45  2   about the *Williamson* decision from Varian.  Fundamentally,

10:11:49  3   all it did was remove the notion that the presumption

10:11:53  4   against 112(6) is quote, strong and that the claim only

10:11:58  5   needs to be devoid of any structure.  It did not erase the

10:12:02  6   guidance that the Federal Circuit had provided in the years

10:12:06  7   prior and even since that's present in, for instance, the

10:12:09  8   *Watts* case and the *Lighting World* case.

10:12:11  9           And you can see that, for instance in the

10:12:13  10  *TriPlay* decision out of this district after *Williamson*

10:12:18  11  quoting the guidance from *Lighting World* and relying it.

10:12:22  12           Just to take up the issue of nonce words, I

10:12:27  13  wanted to go back to really what it means because *Williamson*

10:12:30  14  told us, *Williamson* told us -- I'm looking at the next slide

10:12:34  15  here, 113 -- that nonce words are quote nothing more than

10:12:39  16  verbal constructs.

10:12:41  17           THE COURT:  Can I interrupt you here?  Again, we

10:12:43  18  have reviewed the law.  I know what a nonce word is.  I need

10:12:47  19  you to focus on the specifics here.  Don't --

10:12:52  20           MR. EDWARDS:  Yes, Your Honor.

10:12:52  21           THE COURT:  I have read the law, I read your new

10:12:55  22  cases.  I don't understand why there were so many new cases

10:13:00  23  that you didn't cite in the first place, but nevertheless,

10:13:02  24  we have gone through and read them.  I need you to focus me

10:13:06  25  on the specifics.  What supports your arguments here?

10:13:11  1          MR. EDWARDS:  Let me start with what has

10:13:14  2   happened since the briefing closed.  Let me jump to that,

10:13:23  3   please.  I want to preface -- we're going to get into all

10:13:30  4   the intrinsic evidence, but I want to preface this by saying

10:13:33  5   this PTAB in its institution decisions on the '096 already

10:13:38  6   decided against Varian's position.  This happened since the

10:13:42  7   briefing and, of course, we submitted those in a

10:13:44  8   supplemental authority.

10:13:46  9          THE COURT:  But the PTAB didn't really explain

10:13:50 10   anything, they just said yeah, there is a presumption, the

10:13:56 11   patent owner says the person would understand it, and we

10:13:59 12   agree.  There is not a real heck of a lot of analysis there

10:14:03 13   for me to latch on to, is there?

10:14:05 14          MR. EDWARDS:  There is not a lengthy analysis,

10:14:08 15   Your Honor.  I will say that Varian advocated the same

10:14:11 16   position there using the same authority that it used here

10:14:16 17   making the same arguments and even submitting declarations

10:14:21 18   by the same expert.

10:14:22 19          Your Honor, I will say, is not bound by this

10:14:25 20   decision.  But importantly, the parties agree that this

10:14:29 21   decision, both of these decisions would say the same thing

10:14:32 22   and reach the same conclusion.  They're more than just

10:14:37 23   instructive, they're intrinsic evidence for claim

10:14:40 24   construction purposes of whether the computer terms are

10:14:42 25   subject to 112(6).

10:14:46  1          It's hard to understand how Varian can meet its

10:14:50  2    burden to show the opposite of what the intrinsic evidence

10:14:54  3    now says, and show that 112(6) applies when you have

10:14:59  4    intrinsic evidence now directly on point that was the

10:15:03  5    product of the same advocacy that's being presented to Your

10:15:07  6    Honor in --

10:15:08  7          THE COURT:  And just so I understand, the

10:15:11  8    intrinsic evidence that you are currently pointing me to are

10:15:14  9    these sort of conclusionary statements from the PTAB, that's

10:15:19 10    what you're currently referencing saying there is direct

10:15:24 11    intrinsic evidence, it's just this kind of conclusionary

10:15:28 12    stuff from the PTAB.

10:15:29 13          MR. EDWARDS:  It's the decision from the PTAB

10:15:32 14    that 112(6) does not apply to these claims.

10:15:35 15          THE COURT:  The decision that we've already

10:15:37 16    talked about didn't really give me much analysis; right?

10:15:42 17          MR. EDWARDS:  There is not a lengthy analysis

10:15:44 18    there, although it does go through what the contentions are

10:15:48 19    and disposes of them according to the same claim

10:15:52 20    construction standards that Your Honor has to apply.

10:15:57 21          If Your Honor doesn't mind, I would like to move

10:15:59 22    into directly looking at the other intrinsic evidence that

10:16:03 23    we believe supports our position.

10:16:04 24          THE COURT:  That would be great.

10:16:07 25          MR. EDWARDS:  I want to start with the way

10:16:09 1    Varian has framed this issue and I notice something

10:16:13 2    interesting.  Varian hasn't argued that every instance of

10:16:18 3    computer in these claims invokes 112(6).  In fact, they

10:16:23 4    haven't even argued that every instance where computer is

10:16:27 5    followed by a function invokes 112(6).  Instead, they have

10:16:32 6    raised this issue only as to instances where computer is

10:16:36 7    coupled with the term computation.  And in general, Your

10:16:42 8    Honor, this runs afoul of the principle claims terms should

10:16:46 9    be construed consistently within a patent and even within

10:16:49 10   the same term.

10:16:50 11               I want to give you a good example.  In the '283

10:16:53 12   patent, if you'll look at slide 107, you can see that claim

10:16:57 13   25, I have put up here, I have underlined to show that it's

10:17:03 14   an apparatus claim.  I have highlighted the disputed terms

10:17:06 15   in yellow.  In blue, I have highlighted other instances

10:17:11 16   where the computer is adapted to perform a function, but

10:17:15 17   those are instances where Varian hasn't alleged that

10:17:19 18   means-plus-function applies.  And if you take a closer look

10:17:23 19   and compare the very first one in yellow, the computer

10:17:27 20   adapted to computationally obtain a beam arrangement and you

10:17:32 21   compare that to the last paragraph, it's the same computer

10:17:36 22   that's being further adapted to reject a change to that

10:17:39 23   arrangement or to accept a change to that arrangement

10:17:42 24   depending on the circumstances that are recited there in the

10:17:45 25   claim.  So you have this inconsistency in the way that

10:17:49 1    Varian itself has framed and brought this argument to the

10:17:52 2    Court and we think it undermines, based on the intrinsic

10:17:55 3    evidence, the validity of their position.

10:17:58 4              The same problem and inconsistency appears if

10:18:02 5    you look at the next slide, 108, in the '096 Patent claims.

10:18:06 6    I'm not going to repeat it, but it happens again there in

10:18:09 7    claim 31, for instance.  It also happens in claims 21 and

10:18:14 8    23.  If you look at the slide 109 that I pulled up, wherein

10:18:19 9    these claims Varian has agreed that the means-plus-function

10:18:23 10   dispute doesn't even touch these claims and yet there you

10:18:26 11   have a computer being used to definitively compare some

10:18:30 12   things that are being recited in the claims.  We submit that

10:18:33 13   this inconsistency is intrinsic evidence that Varian's

10:18:37 14   position is incorrect and shouldn't be adopted.  But that's

10:18:41 15   not all that is in the claims that shows that computer

10:18:44 16   connotes structure.  If you take a look at slide 117, I have

10:18:51 17   taken the liberty of pulling some of the claim language out

10:18:54 18   from the '283 and '096 Patents.  Most of these phrases here

10:19:00 19   talk about how the computer has data entered into it.  You

10:19:02 20   can enter the dose prescription into the computer.  You can

10:19:02 21   graphically enter it into the computer.  You can directly

10:19:12 22   enter it into the computer.  You can enter it graphically

10:19:16 23   using a pointing device.  All of these claim limitations

10:19:19 24   talking about the computer connote that the computer is a

10:19:23 25   structure, it is not a black box verbal construct, it's a

thing that someone is physically interacting with.  People of skill in the art have been doing this a long time with computer when they are coming up with radiation therapy plans and, in fact, administering them.

The second to last one in this slide talks about how the computer is in communication with the conformal radiation therapy apparatus.  Again, that connotes structure.  A verbal construct can't be in communication with this big machine that delivers radiation.  So we suggest that there is claim language itself suggesting the computer connotes sufficient structure.

That same language is of course reiterated in various places in the specification, but I also want to point out some other things in the specification that connotes structure.  If you take a look at slide 118, you can see I pulled a few instances of this from the specifications.  The very top one is from the '096 Patent and it talks about particular specs for the computer that can be used to do the plan optimization.  It talks about the processors that can be used, how many of them.  It talks about the operating system and how many megabytes of RAM can be used.  This is even in common parlance pointing to a person and a person of skill in the art to a physical object that we all know, we're all looking at computers right now, they all run operating systems and have RAM and you can use

10:20:57 1    your mouse to input data.  So that's the kind of thing that

10:21:00 2    is connoted in the specification and in the claims.

10:21:04 3            The second pullout here shows up in both the

10:21:06 4    '096 and '283 Patents and we think it's telling because it

10:21:10 5    says the optimization method can be carried out using

10:21:14 6    conventional equipment.  And that conventional equipment

10:21:18 7    includes a conventional computer or set of computers.  We're

10:21:22 8    not talking about an abstract concept, we're talking about

10:21:26 9    using actual computers.  The last pullout here also shows up

10:21:31 10   in both patents and it says something a little different

10:21:33 11   that relates to some other points I've already made, but it

10:21:36 12   says a suitable computer can be used not just in the plan

10:21:42 13   optimization, but in other steps of the radiation planning

10:21:45 14   systems.  So again, one example of that would be

10:21:47 15   communicating with the linear accelerator.  This is a fair

10:21:54 16   amount of intrinsic evidence pointing to the fact that

10:21:57 17   computers are structural things and not verbal constructs.

10:22:04 18           I want to jump ahead a couple of steps and talk

10:22:08 19   about the extrinsic evidence.  Best Medical submitted a

10:22:12 20   declaration from Dr. Ramsey.  Let me pull up a slide to

10:22:16 21   guide us through.  There we go, slide 121.  Dr. Ramsey

10:22:22 22   compared more than 20,000 radiation patients in twenty plus

10:22:26 23   years in the field.  He has been involved in more than a

10:22:29 24   half a million radiation therapy procedures published

10:22:32 25   extensively.  He confirmed in his declaration that the

10:22:35  1   computers used in this field are actual devices and that the

10:22:38  2   use of the term computer in the claim connotes structure.

10:22:42  3   His opinion was based on the intrinsic record and on his

10:22:45  4   experience.  And in addition, it's consistent with the

10:22:48  5   extrinsic dictionary definitions that were provided not just

10:22:52  6   by Best Medical, but by Varian itself.

10:22:55  7          And I have taken the liberty of putting those up

10:22:58  8   on the same slide.  The top one, a computer programmable

10:23:02  9   computer device that can store, retrieve, and process data.

10:23:07 10   That's a dictionary definition that we submitted, Your

10:23:12 11   Honor, that connotes structure right on its face.  It's not

10:23:15 12   a verbal construct, it's the thing we're using in usually an

10:23:21 13   electronic device.  Varian in a definition supports our

10:23:24 14   definition.  They like to stress that the definition they

10:23:26 15   came up with is a little more abstract and it says one that

10:23:30 16   computes.  But if you look right below it, it says

10:23:33 17   specifically and the details there are much like the

10:23:36 18   definition that we submit.  In fact, below that it uses it

10:23:39 19   in a way similar that it's being used in the claims, it says

10:23:42 20   using a computer to design 3-D models.  So even Varian's

10:23:47 21   dictionary definition we submit connotes a fair amount of

10:23:51 22   structure.

10:23:52 23          Turning to Dr. Gall's declaration, we think he

10:23:59 24   was laboring under an improper legal standard.  I know Your

10:24:02 25   Honor asked me to jump ahead, but there was some confusion

and there is some confusion in the case law about what it takes to connote structure to computer implemented invention.  We submit that the *Apple* case made clear and it's still good law that the claims do not have to recite an algorithm for the software for a computer implemented step to avoid the application of 112(6), yet Dr. Gall went looking in the claims -- and I'll pull up the slide, 122. It appears that he went looking in the claims for exactly what is not required, the algorithm of a software.  We submit that he was laboring under the misapprehension that he needed to apply what we would refer to as an aristocrat level of disclosure when, in fact, that's not the standard. The aristocrat level of disclosure pertains to invalidity by indefiniteness and pertains to claims that are already subject to 112(6).  That's not the right standard and we think his declaration should be discounted appropriately because we think he was laboring under the wrong standard.

I want to step outside of the extrinsic evidence because I did notice something interesting in Varian's tutorial.  And I'm going to try to pull it up on the screen for Your Honor, if I can.  It's going to take a moment.  Is that showing up for you, or are you still seeing the slide?

THE COURT:  I see a slide that has some pictures on it.

MR. EDWARDS:  Does it say Algorithms For

10:25:44 1    Optimizing Treatment Plans?

10:25:45 2                THE COURT:  Yes.

10:25:46 3                MR. EDWARDS:  This is page 27 in Varian's

10:25:52 4    technology tutorial.  And you can see them say an optimized

10:25:57 5    treatment plan can be generated using a computer programmed

10:26:00 6    with treatment planning software.  And look how they

10:26:04 7    depicted it right above there, a couple of people sitting at

10:26:07 8    a computer.  And then they have depicted the screen

10:26:12 9    displaying some of the data.  We think this sort of makes

10:26:14 10   our point that people of skill in the art using a computer

10:26:17 11   to perform treatment planning are using the physical device

10:26:21 12   that has structure.  They don't think of the abstract notion

10:26:27 13   of something that merely computes when they think about

10:26:31 14   using a computer to do this.  And that's what's happening in

10:26:34 15   the claims, it's the physical structure that everybody

10:26:37 16   understands to be a computer.

10:26:41 17               Before turning this over, I do think it's

10:26:45 18   important for me to switch gears for a moment and talk about

10:26:48 19   a separate basis that Your Honor has for finding in our

10:26:52 20   favor that is specific to the method claims which is the

10:26:55 21   majority of the claims that are implicated by this dispute.

10:27:00 22               The Federal Circuit has explained in the *Masco*

10:27:05 23   case that where you have a method claim that does not recite

10:27:10 24   steps for or means for, and therefore, you have a step

10:27:15 25   followed by a function but without the magic language to

presume that 112(6) does apply, you have the similar

presumption that it doesn't because you don't have that

language.   And what *Masco* court said and it's still good law

today that is if the step that's recited contains an act in

support of that step, then 112(6) is not invoked.   This is a

slightly different analysis than as applied to

means-plus-function claims for the analysis claims and as I

said it's still good law and you can see that in three

decisions just from this district in the last three-case,

the *Sprint* case, the *Fraunhofer* case, and one of the *Techno*

*View* cases where they applied *Masco*.   If you apply the *Masco*

test here, 112(6) can't apply to the method claims.   None of

them recite step four, they all say steps of.   So the

presumption against 112(6) applies.   And each computer

limitation in the method claims recites an act using a

computer, that's an act in support of the step.   We submit

that under the *Masco* line of cases that as an independent

basis for finding that 112 doesn't apply to the method

claims that is a clear path to our position.

          Now, to be fair, there are a couple of narrow

exceptions to the *Masco* rule, and some cases have applied

means-plus-function analysis to structural limitations that

show up inside of method claims --

          THE COURT:   Can I ask you, where is this case

that you're citing to me now?   I don't remember this

argument in the papers and I don't know what the citation

is, which case?

MR. EDWARDS:  Yes, Your Honor.  It's *Masco v.*

*United States*, 303 F.3rd 1316 out of the Federal Circuit in

2002.  It was not cited in the papers, Your Honor.

THE COURT:  Why not?  If it's so important and

it takes out all of these claims, why wasn't it cited in the

papers?

MR. EDWARDS:  Your Honor, I honestly don't know.

As you may recall, my firm took up this case after claim

construction briefing was completed.  We identified this

issue in the build up to this hearing and we disclosed it to

the other side as soon as we identified it.  I can't speak

to why it wasn't in the briefs.  I'm afraid I wasn't part of

the briefing.

THE COURT:  And when you say you disclosed it to

the other side, when was that?

MR. EDWARDS:  Earlier this week.  I believe

Tuesday morning, their time.

THE COURT:  Okay.

MR. EDWARDS:  So just to be fair and round out

this for Your Honor, there are two narrow exceptions to this

*Masco* rule and that is something that Judge Burke explained

in a different *Techno View* case, 2018 Westlaw 6427874, he

explained that cases will sometimes apply

means-plus-function analysis to structural limitations

inside of method claims, but only when one of two things is

true, either the limitation itself employs the means for end

quote language, which doesn't apply here, we don't have

that, or the limitation itself is clearly the point of

novelty in the invention.  That's not the case here, either.

The use of a computer is not the gee wiz here,

Your Honor, it's the steps themselves.  It's no surprise

that there is not a ton of detail about the computer in the

claims because it's the steps themselves that were the

advance in the art.  Everybody was already using computers

to perform plan optimization and come up with beam

arrangements, so we don't think that exception to the *Masco*

analysis applies here.

In short, Your Honor, we have got long list of

intrinsic evidence and extrinsic evidence that's consistent

with it, and we don't think that Varian can overcome that

and show by a preponderance that 112(6) applies to these

computer limitations.  With that, I would turn it over to

opposing counsel on this term, unless Your Honor has any

questions.

THE COURT:  Nope.  Let me hear from defendants.

MR. LAM:  Thank-you, Your Honor.  Good morning.

This is Lee Lam for the Defendant, Varian parties.  Your

Honor, we appreciate the Court's overruling of our previous

10:32:06 1    objections to, I'll refer to Best Medical International as

10:32:12 2    BMI if it pleases the Court, BMI citations of additional

10:32:17 3    cases this week.  But what we heard from BMI's counsel for

10:32:20 4    the past few minutes was not just authority, it's a

10:32:25 5    brand-new argument and we would object on a different basis.

10:32:28 6    We don't think brand-new argument, nobody has ever suggested

10:32:32 7    that step-plus-function construction or that

10:32:35 8    step-plus-function issues apply to this case.  BMI counsel

10:32:42 9    spent the past few minutes focusing on *Masco*, an 18-year old

10:32:46 10   case that they did bring to our attention the day before

10:32:49 11   yesterday or three days ago.  We weren't aware of the

10:32:52 12   argument that they were going to use the *Masco* case which is

10:32:56 13   this step-plus-function argument.  We object.  That's new

10:33:00 14   argument.  It should be deemed improper and should be

10:33:03 15   waived.

10:33:03 16           THE COURT:  I gave you an opportunity to go back

10:33:05 17   review the pages.  You could have talked to them about what

10:33:08 18   they wanted to do with them.  You could have had more time,

10:33:11 19   you didn't take it, so let's just deal with the issues that

10:33:14 20   we have here.

10:33:15 21           MR. LAM:  Will do, Your Honor.  Thank-you.  Does

10:33:18 22   Your Honor have any questions before I begin?

10:33:21 23           THE COURT:  No.  I do want to understand your

10:33:25 24   response to the point that was made that the claims use the

10:33:31 25   word "computer" multiple times, sometimes with functional

10:33:36 1    language following it, sometimes not with functional

10:33:40 2    language.  It's the same computer.  So how does that factor

10:33:44 3    into your arguments that it should be means-plus-function?

10:33:49 4    That I would like to hear first.

10:33:51 5              MR. LAM:  If Your Honor is asking whether every

10:33:54 6    instance in which the word "computer" shows up followed by

10:33:57 7    functional language, whether or not we raise that for claim

10:34:03 8    construction, my answer to that question, Your Honor, is we

10:34:07 9    believe that the predicate issue of whether or not

10:34:11 10   means-plus-function construction should apply under

10:34:14 11   *Williamson* is consistent for all of those.  You have to look

10:34:18 12   to the claim language to see whether the claim language

10:34:21 13   recites sufficiently sufficient structure for the recited

10:34:27 14   function.  And we think that the --

10:34:30 15             THE COURT:  But what about when the term

10:34:33 16   computer is used but there is no function associated with it

10:34:41 17   in a particular part of the claim?

10:34:44 18             MR. LAM:  Well, those instances in which the

10:34:47 19   term computer appears, sometimes in the same claims, I think

10:34:52 20   BMI counsel referred to the examples where computer appears

10:34:52 21   elsewhere in the same claims as well as different claims.

10:35:00 22   The question, Your Honor, is whether the language sublating

10:35:05 23   those instances of a computer speak to or bear on whether or

10:35:10 24   not the computer that proceeds the recited functions that

10:35:14 25   we've raised for Your Honor's construction speaks to those

functions.

And we submit, Your Honor, that those are different aspects of the same computer, that is true, but the Williamson test is whether or not the disputed term connotes sufficient structure for the recited function.  And we're focusing on computational functions that we selected a handful of because we believe there is a uniform algorithm that applies to those handful of functions.  And to be candid, Your Honor, we didn't want to raise other computer term disputes that might not matter in this case, especially with a limit on the number of terms --

THE COURT:  But the use of the term computer in those claims whether it is followed by functional language or not followed by functional language is the same computer.

MR. LAM:  Where it appears in the same claim and if it derives at the antecedent basis from the same computer term, the answer is yes.  Yes, Your Honor.

THE COURT:  Okay.

MR. LAM:  We're adopting a consistent approach and we have raised the computer terminology that corresponds to a handful of functions that we believe uniformly require a simulated annealing algorithm structure in order to connote sufficient structure for that --

THE COURT:  Right.  Where I'm confused, let's look, for example, at claim 40 of the '283 Patent.  There it

10:36:48 1    talks about entering the desired partial volume data into a

10:36:53 2    computer.

10:36:54 3                MR. LAM:  Yes.

10:36:54 4                THE COURT:  That is not deriving antecedent

10:37:02 5    basis from anything that you could argue is

10:37:03 6    means-plus-function.  It then later talks about using that

10:37:06 7    computer to computationally calculate the opened optimized

10:37:11 8    radiation beam arrangement.  How far is it that the

10:37:14 9    computer -- I'm trying to understand how both of those

10:37:18 10   computers as I think you're saying are subject to

10:37:27 11   Section 112(6).

10:37:29 12               MR. LAM:  Your Honor, we'll go to that claim.

10:37:31 13   Jose, if you don't mind going to slide number 5 of Varian's

10:37:37 14   deck.

10:37:38 15               THE COURT:  I really want you to answer my

10:37:40 16   question while I'm focused on it.

10:37:42 17               MR. LAM:  Yes.  I'm looking at claim 40 now,

10:37:45 18   Your Honor, on slide 5 of Varian's presentation.  Do you see

10:37:49 19   that as well?

10:37:49 20               THE COURT:  I have Best's presentation, but I

10:37:52 21   have claim 40 here.

10:37:54 22               MR. LAM:  Claim 40, I'm looking at claim 40 on

10:37:57 23   my screen as well.  I don't know if claim 40 shows up on

10:38:00 24   your screen from slide 5 of Varian's presentation.

10:38:02 25               THE COURT:  I got it.  I have it.

10:38:05  1          MR. LAM:  So Your Honor's question was that the

10:38:08  2    first time the word computer is introduced in that claim is

10:38:12  3    in the body of the claim that reads entering the desired

10:38:16  4    partial volume data into a computer and the term that we

10:38:21  5    submitted for Your Honor's construction is at the end of

10:38:25  6    that claim which reads using the computer to computationally

10:38:30  7    --

10:38:30  8          THE COURT:  I understand that.  I understand

10:38:32  9    that.  But what I'm not understanding is those are both the

10:38:35 10    same computer.  Right?

10:38:38 11          MR. LAM:  That's correct, Your Honor.

10:38:39 12          THE COURT:  They're both talking about the same

10:38:41 13    computer.  So how is it that I am supposed to say the

10:38:45 14    computer that is the subject of the entering steps is

10:38:48 15    subject to Section 112(6)?  That's what you need to convince

10:38:51 16    me because those are both the same computers.  The first

10:38:58 17    time the computer is referenced is not with respect to a

10:39:03 18    function, but yet you want me to say that it's the same

10:39:08 19    computer and therefore I would be saying that computer is

10:39:14 20    subject to Section 112(6).

10:39:17 21          MR. LAM:  That's right, Your Honor.  That is our

10:39:20 22    position.  The reason is that that --

10:39:22 23          THE COURT:  But what I need you to tell me is

10:39:24 24    why I should and can do that based on precedent.

10:39:30 25          MR. LAM:  Your Honor, the reason is that the

same computer must satisfy all limitations of claim 40.  The

antecedent "a computer" is the same as the subsequent "the

computer."  We know from the last limitation of the claim

that the computer has to computationally calculate an

optimized beam arrangement.  And the *Williamson* question is,

does the term computer there connote sufficient structure to

perform that recited function.  And in order to satisfy --

THE COURT:  Let me understand.  If the claim,

claim 40, if it ended after the in response step, then that

computer in that claim would not be subject to

Section 112(6); is that right?

MR. LAM:  It depends on the rest of the claim

limitations, Your Honor, if we exclude --

THE COURT:  No, I'm asking you, I'm asking you

if the claim ended after the in response to the desired

partial volume data step, then that computer is not subject

to 112(6).  Is that right?

MR. LAM:  Your Honor, I'm afraid the answer is

no, because in response to the desired partial volume data,

the computer that must computationally approximate, you

would have to look to whether or not the claim imparts

sufficient structure for the computationally approximate

function.

THE COURT:  Let me ask you this.  Let's say it

stopped after the entering step, is that computer subject to

10:41:20 1    **112(6)?**

10:41:21 2                    MR. LAM:  Then the answer is no.  Taking a

10:41:23 3    consistent approach.  Because therein you would have a claim

10:41:27 4    that -- using claim 40 as the example, where the claim has a

10:41:33 5    period and the claim stops after the first instance of the

10:41:37 6    word computer, there would be no functional recitation

10:41:42 7    attributed to the computer terminology.

10:41:54 8                    THE COURT:  Okay.

10:41:55 9                    MR. LAM:  And this is an important point, other

10:41:57 10   than the notion that the computer must receive data that's

10:42:00 11   being entered into it and for that purpose, Your Honor, and

10:42:03 12   this is a key distinction, a generic computer that anyone

10:42:08 13   could understand would be able to carry out that function.

10:42:15 14   We know computers accept data.  We know computers store

10:42:18 15   data.  We know they process data.  But our point is when

10:42:22 16   you're talking about functionality such as computationally

10:42:27 17   calculate the radiation beam arrangement, we have to look

10:42:30 18   for something more.  It's not a general purpose conventional

10:42:35 19   or garden variety computer that carries out those functions,

10:42:39 20   it has to be something different.  So the question is does

10:42:44 21   the word computer suffice?  The answer is no, it doesn't

10:42:48 22   suffice under the *Williamson* standard.

10:42:50 23                    Your Honor, I would entertain any other

10:42:52 24   questions the Court has before I start addressing some of

10:42:56 25   the points that BMI counsel made, but I appreciate that this

particular issue that Your Honor raised is critical.

THE COURT:  I don't have anymore questions.  Go ahead and give me whatever you think I should know.

MR. LAM:  Let's go to number 6, Mr. Martinez.

Your Honor, I just would like to point out that although I heard BMI counsel say that *Williamson* did not, Your Honor, do any prior guidance, *Williamson* itself talks about what it expressly overruled.  We highlighted the passages from *Williamson* here.  Your Honor is familiar with the case, but this is why we're focused on the *Williamson* case and it has established a standard that I don't think anything that BMI counsel has raised purports to undo.  The *Williamson* standard is whether the disputed term connotes sufficient structure to perform the recited function.  That's what Your Honor just spent the last three minutes looking at claim 40 for.

Mr. Martinez, let's go to number 2.

I'll recap, Your Honor, why means-plus-function construction should apply under *Williamson* and under the *Sarif* decision that Judge Stark issued on number three, slide number three in Varian's presentation, Your Honor, these are the recited functions that correspond to the computer terms that we submitted for the Court's construction.  They're separate from the data entry aspects or the other functions that BMI counsel highlighted in

various other parts of the claims, whether they were the
same claims or different claims.

These functions are computationally obtain a
proposed beam arrangement on or a proposed set of beam
weights.  Computationally change the arrangement
iteratively.  Computationally calculate and optimized the
arrangement.  Those are the functions for which we have to
answer the question, does the word computer suffice as
structure to carry out those functions?  And the answer is
no.

How do we know?  Well, we go to slide 7,
Mr. Martinez.  Here is how we know, Your Honor, that
computer does not connote specific structure.  And BMI
counsel quoted the same excerpts from the patent
specifications, Your Honor.  Because these patent
specifications separate now from any given algorithm or
simulated anneal algorithm, both the '283 and '096 Patents
refer to computers generically.  The specifications refer to
a conventional computer or even a set of computers, in other
words, it can be more than one.  It refers to --

THE COURT:  Do you agree that in looking to see
whether or not the term is subject to Section 112(6) that I
should look at all of the intrinsic evidence including
looking for structure in the claims as well as in the
specification?

10:46:37 1           MR. LAM:  Your Honor, I do agree that the Court
10:46:43 2   should look to all of the intrinsic evidence if the claim
10:46:46 3   language itself does not answer that question.  And as we
10:46:49 4   know, the claim language itself just says the word computer
10:46:51 5   to computationally do something.  But here we're looking to
10:46:59 6   the specification and we're looking to what computer might
10:47:02 7   mean separate from any specific algorithm and what computer
10:47:06 8   might mean is conventional or set of computers or suitable,
10:47:14 9   we know the patent would not recommend something not
10:47:17 10  suitable and the patent says for illustration purposes only
10:47:21 11  a pentium computer could be utilized.  The point here is
10:47:26 12  that standing alone computer does not connote any specific
10:47:29 13  structure, especially for carrying out the recited functions
10:47:33 14  that we're focused on.
10:47:40 15          Let's go to number 8.  Your Honor, we know this
10:47:46 16  because BMI has repeatedly made our point for us.  These are
10:47:50 17  quotes of BMI's own statements from their reply brief and I
10:47:54 18  have given the joint page brief citation on slide 8 of
10:47:58 19  Varian's presentation.  These are BMI's own statements.
10:48:02 20  Their expert, Dr. Ramsey, says the same thing.  And what
10:48:06 21  they say are the specifications in the first bullet point,
10:48:10 22  the specifications of both patents articulate what needs to
10:48:14 23  be done or is accomplished by the computer, outline the
10:48:17 24  structure, including the types of computer algorithms that
10:48:20 25  define the structure.  Yes, that's our point.  The function,

10:48:23 1    the second bullet point, Your Honor, the function being

10:48:26 2    performed is directly associated with, or linked to steps

10:48:29 3    for determining an optimized radiation beam arrangement.

10:48:34 4    These steps being clearly defined algorithmic operations set

10:48:38 5    out in the specification, to transform the computer to a

10:48:42 6    specific purpose computer.   That is every functional

10:48:46 7    recitation that we've raised for the Court's construction is

10:48:50 8    for a specific purpose.   That is the reason why saying

10:48:55 9    computer isn't sufficient.

10:48:59 10           And finally, in the last bullet point, Your

10:49:02 11   Honor, both BMI and its expert refer to operations

10:49:07 12   associated with treatment planning and radiation dosimetry

10:49:12 13   that go well beyond general data processing and routine

10:49:16 14   computation of a generic computationally device.

10:49:21 15           So, Your Honor, in your previous question to me

10:49:23 16   about claim 40 about whether or not if the claim had ended

10:49:27 17   after the phrase entering data into the computer, would that

10:49:31 18   computer be subject to *Williamson* and Section 112(6), the

10:49:37 19   answer is no, because we know any computer can accept data,

10:49:41 20   but we're not talking about functions that only amount to

10:49:44 21   routine acceptance of data, we're talking about functions

10:49:48 22   that require computationally retaining and optimizing.

10:49:52 23           Your Honor, I don't know whether Your Honor

10:50:01 24   wants me to get into the *Sarif* case at length.   Let's go to

10:50:07 25   number 10, Mr. Martinez.

We think that Judge Stark's decision in *Sarif* is completely on point.  And, Your Honor, BMI has basically shifted its attack on *Sarif*.  BMI previously asserted that Judge Stark basically bypassed an analysis of the question why means-plus-function construction should apply under *Williamson*, and we've block quoted *Sarif*, we block quoted it in the joint brief at page 32.  It's the same excerpt that we block quoted.  But now that BMI was obviously wrong given the analysis that we've reproduced here, it's introduced several other ways of trying to avoid *Sarif* or distinguish *Sarif*.

Mr. Martinez are you able to pull up BMI slide 123?

THE COURT:  I have it.

MR. LAM:  We'll get it also, Your Honor.

THE COURT:  I have it.  It's already in front of me.  Do you want to just tell me what your argument is?

MR. LAM:  Yes.  Your Honor, they make three points, BMI makes three points on slide 123, different patent, different history, et cetera.  Of course it's a different patent.  If Judge Stark had evaluated the same patent we wouldn't be here.  Did not involve method claims.  That's the argument we heard about I think based on the *Masco* case.  But nobody, Your Honor, is disputing that *Williamson* and means-plus-function construction can apply to

claim terms in method claims.  And Your Honor, if BMI is denying that now, I have case cites that I would like to offer the Court to the contrary.  One is *Media Rights v. Capital One Financial*.  The F.3d citation is 800, F.3d 1366. The *Media Rights* case, in the *Media Rights* case the Federal Circuit not only applied means-plus-function determination to a means plus, it applied a *Williamson* analysis to that term and the term there, it wasn't computer, otherwise we would have cited it, Your Honor, was compliance mechanism.

Another case is *T-JAT*, that's T-J-A-T, *T-JAT Systems v. Expedia*, that was an August 20, 2019 decision by Judge Andrews in this district.  The Westlaw citation is 2019 WL, for Westlaw, 3944014.  And in that instance, Judge Andrews applied *Williamson* as well to the term "virtual client entity" in a method claim.  I don't know whether BMI is denying that you can ever apply means-plus-function as opposed to step-plus-function treatment or *Williamson* treatment to a term in a method claim, but if that's BMI's argument, it's firmly refuted.

Lastly on this slide, BMI says that Judge Stark in *Sarif* did not hold that computer is a nonce word.  That's right.  He did not say the phrase nonce word like an incantation, but he did find that in the *Sarif* case the phrase computer adapted to did not connote sufficient structure for the recited functions that he was analyzing.

And that's the question that's being posed here the same way.

In addition to the *Sarif* case, Your Honor, Mr. Martinez, if we can go back to Varian's presentation, slide number 13, we have other cases that applied *Williamson* treatment to variations of computer terminology, whether it was computer itself or computer system and other variants. These, Your Honor, were pre-*Williamson*.  This was when the presumption against means-plus-function treatment was still strong.  So even pre-*Williamson* courts have applied Section 112(6) to computer.  This is in addition to Judge Stark's decision in *Sarif*.

Now I'll turn to some other points in BMI's presentation.  So let's pull up BMI's presentation again, Mr. Martinez.

Let's go to 111, Your Honor.  I have taken the liberty of orange highlighting some of the snippets of BMI's presentation that they submitted and exchanged with us yesterday.  Here they have quoted the *Williamson* standard. We all agree that that's the proper standard.  Yet on the next slide, 112, BMI 112, every Federal Circuit case they cite here, Your Honor, is pre-*Williamson*.

BMI also repeatedly refers to the *Apple* case. We heard BMI counsel mention that during oral argument.  I counted five or six times the Apple case shows up in the

10:56:21 1    slide deck.  And again, this was raised a few days ago to

10:56:25 2    us, so we scrutinized it and we actually found a

10:56:28 3    post-*Williamson* case that really puts *Apple v. Motorola* into

10:56:33 4    context.  I'll give Your Honor that case citation.  It's

10:56:37 5    called *Grecia v. Samsung*.  *Grecia* is spelled G-R-E-C-I-A.

10:56:44 6    And in *Grecia*, the Federal -- the reporter cite is 780 Fed

10:56:54 7    appendix 912 (7).  It was an August 20, 2019, decision.

10:57:03 8    August 20, 2019.  In the *Grecia* case the Federal Circuit

10:57:07 9    said that the plaintiff's reliance on this *Apple v. Motorola*

10:57:11 10   case was misplaced because *Williamson* specifically overruled

10:57:15 11   the strong presumption that had been applicable during the

10:57:20 12   *Apple* case.

10:57:21 13            The pincite for that criticism, Your Honor, is

10:57:25 14   page 916.  So 780 Fed Appendix at page 916.

10:57:33 15            Let's move on to slide 113.  Here, Your Honor, I

10:57:40 16   notice that BMI put the phrase computing unit in the

10:57:46 17   structural words column, but there is no per se

10:57:50 18   classification of computing unit as a structurally

10:57:54 19   sufficient term.  We just discussed four cases, three of

10:57:58 20   which were pre-*Williamson* plus the *Sarif* case that say

10:58:02 21   otherwise.  What BMI apparently is relying on shows up on

10:58:06 22   the next slide.  They're apparently relying the *Inventio*

10:58:10 23   case which was again pre-*Williamson*.  And *Inventio*, which I

10:58:12 24   read recently --

10:58:17 25            THE COURT:  What about, wasn't the *Samsung* case,

1  wasn't that this year that's cited in *Inventio*, so I don't

2  think that the fact that it's pre-*Williamson* is too

3  compelling.

4           MR. LAM:  Which *Samsung* case, Your Honor?

5           THE COURT:  The *Samsung* case that's in the next

6  bullet point.

7           MR. LAM:  *Samsung v. Prisua*.  I have a word

8  about this --

9           THE COURT:  You're trying to tell me that

10  *Inventio,* that was pre-*Williamson* so don't pay attention to

11  it.  I'm saying the *Samsung* case that is referenced there

12  for the point is citing the *Inventio* case.

13           MR. LAM:  That's correct, Your Honor.  But I'll

14  also point out that *Inventio* repeatedly refers to the strong

15  presumption back when a strong presumption still applied.

16  I'll give Your Honor the pincites for where *Inventio*

17  specifically explicitly relies on the strong presumption.

18  Same case citation that BMI counsel provided here and the

19  strong presumption explicitly appears on pages 1356 and

20  1358, and again on 1360, 1360.  The court in *Inventio*, Your

21  Honor, also found that a function of the computing unit was

22  to store and execute a program.  I think that's on pages

23  1359 and 1360.  Storing and executing a program like

24  accepting data entry is a routine computing function, so

25  here a generic computing unit would work in that context.

11:00:05 1    *Inventio* wasn't about computationally optimizing a radiation

11:00:10 2    beam arrangement.

11:00:12 3             Let's move on to number 115.  Your Honor, I

11:00:18 4    orange highlighted the question that BMI says is being

11:00:23 5    presented.  That's not the correct test.  They did reproduce

11:00:28 6    the correct test under *Williamson* a few slides earlier, but

11:00:32 7    the test is not whether the disputed term connotes any

11:00:36 8    structure at all, the test is whether the term connotes

11:00:41 9    sufficient structure for the recited function.

11:00:47 10            116, Mr. Martinez.

11:00:50 11            Your Honor was right about the PTAB decision.

11:00:54 12   It's literally two sentences, Your Honor.  Patent owner -- I

11:01:00 13   highlighted those two sentences in orange where the PTAB

11:01:05 14   acknowledges that the patent owner argued that there is a

11:01:09 15   rebuttable presumption and the PTAB notes that the patent

11:01:14 16   owner also contends an ordinarily skilled artisan would have

11:01:18 17   understood, readily understood what a computer is.  That's

11:01:22 18   it, on those two basis the Patent Office or the PTAB

11:01:25 19   concludes that it agrees with the patent owner.  So

11:01:28 20   literally a two-sentence treatment of the *Williamson* issue.

11:01:32 21            In fact, this entire decision does not even

11:01:34 22   acknowledge *Williamson*.  It doesn't cite *Williamson*.  And in

11:01:38 23   any event, as Your Honor pointed out, the PTAB construction

11:01:42 24   or nonconstruction in this case doesn't bind this Court.

11:01:45 25            117, please, Mr. Martinez.

So here we have all the other functionality and, Your Honor, we eluded to this earlier, from various claims that invoke the term computer, these are all data entry -- predetermined prescription entered into the computer, graphically entered into the computer and so forth.  These other data entry aspects of the claims, Your Honor, are distinct from the recited functions of computationally obtaining a proposed arrangement or a set of proposed weights, computationally changing the arrangement or computationally calculating an optimized beam arrangement. Again, the test is whether computer by itself, the term, connotes sufficient structure for those recited functions. These various data entry aspects of the computer, Your Honor, we acknowledge they exist elsewhere in the claims. They don't speak to the issue that we have raised for the Court's construction.  The notion that one can enter data into the computer doesn't resolve the relevant question.

Let's move on to 119.  Your Honor, BMI's counsel did not focus on this argument, but we saw it in their slides.  It looks like a claim differentiation argument, but as we explained in the joint brief at page 29, claim differentiation does not apply to a means-plus-function analysis.

And then finally on slide 121, these dictionary definitions, Your Honor, we think only support our position

11:03:34 1   because as you'll see that I have highlighted here, these

11:03:38 2   definitions are premised on generic computer functions,

11:03:42 3   stored, retrieved, processed data.  Not the recited

11:03:47 4   functions, not the recited functions in the computer terms

11:03:50 5   that we submitted for the Court's construction.

11:03:56 6         Let's go to their last slide, number 142 with

11:04:01 7   the additional authorities.

11:04:03 8         Your Honor, I highlighted every Federal Circuit

11:04:07 9   case on this list.  All of them except for the *Samsung v.*

11:04:11 10  *Prisua* case were pre-*Williamson* as I noted earlier.  The

11:04:16 11  *Samsung v. Prisua* case itself, Your Honor, was an IPR case

11:04:21 12  in which the Federal Circuit found that the board improperly

11:04:26 13  invalidated claims for indefiniteness which was beyond the

11:04:31 14  board's statutory authority.  Neither party in the IPR or

11:04:34 15  the parallel district court litigation raised this

11:04:39 16  means-plus-function treatment.  It was something that was

11:04:43 17  raised by the board *sua sponte* and the Federal Circuit found

11:04:47 18  that the board's reasoning was self contradictory.  And in

11:04:51 19  any event, the IPR that was at issue in the *Samsung v.*

11:04:57 20  *Prisua* case was still subject to the broadest reasonable

11:05:00 21  interpretation standard, BRI, back when BRI still applied,

11:05:07 22  before claim construction standards were reconciled for both

11:05:11 23  IPR proceedings and district court proceedings, after

11:05:14 24  November of 2018.

11:05:17 25         Ultimately, Your Honor, none of these

11:05:19 1    authorities undue or even purport to undue the standard that

11:05:25 2    was established.  If Your Honor has no other questions, I'll

11:05:28 3    turn it over.

11:05:31 4                    THE COURT:  Okay.  Thank you.

11:05:37 5                    MR. EDWARDS:  Your Honor, this is Jeremy Edwards

11:05:40 6    again.  If I may respond briefly to a couple of points.

11:05:43 7                    THE COURT:  Very briefly.  We have been going

11:05:45 8    more than an hour and we're on one term, so you're running

11:05:48 9    out of time, so you have two minutes.

11:05:50 10                   MR. EDWARDS:  *Apple* is still the law after

11:05:52 11   *Williamson* for computer implemented inventions.  *Scientific*

11:05:57 12   *Calculations v. Adtran* in 2016, Judge Robinson's decision,

11:06:01 13   says, "*Williamson* overruled the strength of the presumption

11:06:04 14   applied in *Apple,* but *Apple* remains on point for computer

11:06:09 15   implemented inventions that do not employ

11:06:12 16   means-plus-function language."

11:06:14 17                   That's a doctrine point that is correct and that

11:06:19 18   we believe Varian simply is wrong.

11:06:21 19                   Now, Varian implied that we are proposing some

11:06:26 20   sort of categorical rule for what is and is not a nonce

11:06:31 21   word.  That's not what we're doing.  The MPEP that we

11:06:34 22   provided was simply to show that these decisions have been

11:06:37 23   data logged and to show that on the computer side of things

11:06:41 24   often time these things end up on the structural side.  It's

11:06:44 25   not a hard and fast rule.  You have to look at the intrinsic

11:06:48  1    evidence, of course.

11:06:49  2            Finally, we do think that Varian's counsel

11:06:54  3    misstated the standard why concluding that the claims don't

11:06:56  4    recite a specific structure.  That's not required under the

11:06:59  5    Federal Circuit case law that I cited earlier.  It does not

11:07:02  6    have to connote a specific structure.  A class is

11:07:05  7    sufficient.  And that's what we have here, more than that.

11:07:08  8    So the rest of the points we'll leave to the briefs and I

11:07:12  9    think we can move on to the '175 Patent unless Your Honor

11:07:15 10    has more questions.

11:07:17 11            THE COURT:  No.  Let's move on.

11:07:20 12            MR. EDWARDS:  Let me get myself there and try to

11:07:25 13    bring up the slide show.  I'm not a computer wiz, so it

11:07:37 14    might take a moment.  Are you seeing our slides, Your Honor,

11:07:47 15    with the '175 Patent?  Your Honor, can you see the slide

11:07:58 16    that depicts the '175 Patent?

11:08:01 17            THE COURT:  No.

11:08:10 18            MR. EDWARDS:  I thought I was already sharing my

11:08:13 19    screen.  Let me try again.  How about now, Your Honor?

11:08:17 20            THE COURT:  Yes.

11:08:18 21            MR. EDWARDS:  Excellent.

11:08:20 22            I'm going to skip the recitation about how nifty

11:08:25 23    the '175 Patent is and just jump to our main points.

11:08:34 24            The competing constructions, there is three

11:08:35 25    terms, but I'll just go with objective cost function to

11:08:40 1    start.  We're suggesting it's a plain and ordinary meaning.

11:08:43 2    It's well understood in art, but if a construction is

11:08:46 3    required, we can live with the mathematical function that

11:08:48 4    determines a value based upon factors.

11:08:51 5              THE COURT:  Is the value there a cost value, is

11:08:54 6    it a number, what is it?

11:08:55 7              MR. EDWARDS:  It doesn't have to be, Your Honor,

11:08:57 8    and the claims don't require that.  And we don't think the

11:09:01 9    intrinsic evidence supports limiting it that way.  If you're

11:09:05 10   going to graph additional limitations on claim terms, there

11:09:09 11   has to be sufficient justification in the intrinsic

11:09:12 12   evidence.

11:09:12 13             THE COURT:  Okay.  But why isn't it a cost

11:09:16 14   value?

11:09:16 15             MR. EDWARDS:  Why isn't it a cost value?

11:09:18 16             THE COURT:  It's an objective cost function, I'm

11:09:20 17   not graphing anything, I'm using the language there, what is

11:09:23 18   the value there if it's not a cost value?

11:09:26 19             MR. EDWARDS:  Well, this is some complicated

11:09:29 20   math that I'm not sure I completely understand, but I do

11:09:33 21   understand that a function can determine a value that is

11:09:40 22   another function and not necessarily a numerical value.  So

11:09:43 23   to limit it to a numerical value --

11:09:46 24             THE COURT:  I have moved on from numerical

11:09:50 25   value.  I asked you if it's a cost value.  You just have

11:09:54 1    it's a value.  What kind of value?  Is it a cost value?

11:09:58 2              MR. EDWARDS:  I don't think necessarily, and I

11:10:00 3    don't think anybody is proposing that it has to be a cost

11:10:04 4    value --

11:10:04 5              THE COURT:  But I'm asking you that, because

11:10:06 6    let's say I think value is too broad, so what kind of value

11:10:12 7    is it?  Their position is, look, you have an equation here

11:10:16 8    that is essentially -- you could include any, any

11:10:22 9    mathematical equation would fit with what -- with your

11:10:27 10   description.  So let's say I'm sensitive to that and I say

11:10:32 11   it seems kind of broad to me, how are we supposed to make

11:10:36 12   this actually approximate something that is related to an

11:10:40 13   objective cost function?

11:10:43 14             MR. EDWARDS:  Well, the terms of the claim

11:10:46 15   elsewhere talk about the details of the cost function.  Let

11:10:52 16   me see if I can pull up an example.

11:10:54 17             THE COURT:  Your own expert said that it

11:10:57 18   included a function built upon an analysis of objective

11:11:01 19   factors; right?

11:11:02 20             MR. EDWARDS:  Yes.  Can --

11:11:04 21             THE COURT:  So objective factors, I assume

11:11:06 22   you're okay with it being objective factors?

11:11:10 23             MR. EDWARDS:  I don't know about the factors

11:11:12 24   being objective.  The function is objective.  But if I may

11:11:15 25   point you to any of the asserted claims where this appears,

11:11:19 1   for instance claim 13, let me see if I have that claim 13

11:11:31 2   talks about this objective function T and tells us what it

11:11:34 3   includes, a dosimetric cost term and a delivery cost term.

11:11:40 4   And then it tells you what those things represent.  But

11:11:42 5   that's other claim language, Your Honor.  That's not used to

11:11:45 6   define objective cost function.  So when the claims are

11:11:51 7   providing detail about what the objective cost function is

11:11:54 8   doing, it's right there in other language.  So we don't see

11:11:57 9   how it's proper to further limit this objective cost

11:12:01 10  function language when the details of it are elsewhere

11:12:05 11  provided in the claim.

11:12:08 12          Now, our expert also said that this is a well

11:12:12 13  understood term of art.  I would like to point out that

11:12:15 14  there is no lexicography in the patent for cost function and

11:12:19 15  there is no express disavowal of claim scope in the file

11:12:22 16  history.  Dr. Ramsey explained that this is a term that has

11:12:26 17  a plain and ordinary meaning and doesn't need further

11:12:30 18  construction.  And I notice something interesting.

11:12:32 19  Dr. Solberg who is Plaintiff's -- excuse me, Defendant's

11:12:36 20  other expert who submitted a declaration for claim

11:12:39 21  construction, he had no problem talking about objective cost

11:12:42 22  functions without talking about numerical values or

11:12:47 23  iterativeness.  If you look, I can pull up part of his

11:12:50 24  declaration here on slide 129, all he said was the cost

11:12:55 25  function was an input into the opposite pages algorithm and

1  defines one or more parameters to the opposite.  We think

2  this speaks to our point which is you don't need to further

3  define this term.  Their expert didn't need to when he was

4  talking about it in his declaration.

5          Now, if Your Honor is inclined to put some meat

6  on this and provide perhaps our alternate construction and

7  is trying to weigh that against Varian's proposed

8  construction, I would say the word "numerical" doesn't

9  appear anywhere in the '175 Patent.  The word "iteratively"

10  doesn't appear anywhere in the '175 Patent.  And Varian does

11  point to the fact that the '175 Patent incorporates the '283

12  and '096 Patents by reference.  And it is true there are

13  many references to iterativeness in those patents.  But I

14  would also note that many of the claims in those patents

15  have separate claim limitations expressly requiring quote

16  incorporating a cost function at each iteration.  So when it

17  comes time to specify the cost functions used iteratively,

18  the claim language in those other patents does exactly that,

19  which to us implies they should not be doing that here in

20  the '175 Patent.

21          Perhaps another point, maybe a more minor point,

22  but if you look at the abstract of the '283 Patent, it

23  refers to, "an iterative cost function."

24          Well, that would be redundant if a cost function

25  was necessarily iterative.  So all of this is to say that

11:14:35 1    there is -- in the '283 and '096 Patents that cross

11:14:38 2    functions are not by definition iterative.  Dr. Ramsey also

11:14:45 3    confirmed that in his declaration, which is joint appendix

11:14:50 4    1214.

11:14:51 5              I do want to note that Varian's proposed

11:14:55 6    construction seems to give rise to some confusion, even to

11:14:59 7    Varian in its own briefing.  Varian points to the idea that

11:15:05 8    the cost function is evaluating with respect to a plurality,

11:15:11 9    each in a plurality of intensity maps.  They say that means

11:15:16 10   it's done iteratively.  What do they conclude in their brief

11:15:21 11   at page 56?  They say that that means, "the objective cost

11:15:25 12   function is applied to each intensity map iteratively."  The

11:15:31 13   claims don't say any such thing to the fact that there are

11:15:35 14   multiple intensity maps to be involved doesn't mean that

11:15:39 15   each map gets evaluated iteratively or multiple times.

11:15:44 16   Varian talks itself in circles on that which we think really

11:15:48 17   confuses a jury if you adopt the iterative value on the cost

11:15:53 18   function.

11:15:53 19              A final point I would like to make on this.

11:15:57 20   Varian is talking about calling these costs, these factors,

11:16:02 21   saying they're factors used to -- iteratively used to

11:16:02 22   optimize a beam arrangement.  Those factors, as I mentioned,

11:16:07 23   are already mentioned in the claims elsewhere and in the

11:16:10 24   '175 Patent where it talks about factors it's talking about

11:16:12 25   treatment plan efficiency and dosimetric.  Those show up as

11:16:19 1    the dosimetric term and cost term in the other claim

11:16:23 2    language.  So it's not clear to us why we should be talking

11:16:26 3    about the nature of those factors as part of the definition

11:16:29 4    of the cost function when it's already spelled out that

11:16:34 5    those factors are part of other claim language.

11:16:38 6              It's hard for us to know what to make of

11:16:41 7    Varian's proposal on this front and we think a jury would

11:16:44 8    struggle with that, too.  That's all that I have to say in

11:16:49 9    addition to the briefs about this particular claim term, so

11:16:52 10   I would turn it over to counsel for Varian, unless Your

11:16:55 11   Honor has questions.

11:16:56 12             THE COURT:  No.  That's fine.  Thank you.

11:17:02 13             MR. WONG:  Good morning.  This is Ryan Wong from

11:17:05 14   Keker on behalf of Varian.  I'll be handling the '175 and

11:17:08 15   the '490 terms.  Before I start, I would -- does Your Honor

11:17:13 16   have any questions that the Court would like to ask?

11:17:19 17             THE COURT:  No.  Thanks for asking.

11:17:21 18             MR. WONG:  Okay.  So I think the question here,

11:17:25 19   and some of Your Honor's questions eluded to this, is

11:17:30 20   whether the proposed construction of objective cost function

11:17:35 21   from BMI has enough meat on the bones, using Mr. Edwards'

11:17:41 22   phrase, so that it wouldn't cover basically any sort of

11:17:45 23   mathematical function.  And we have here slide 16.  Thank

11:17:50 24   you, Mr. Martinez, from Varian's slide deck.

11:17:54 25             And first of all, the reason to construe this

11:17:58 1   term is exactly the concerns I believe Your Honor raised

11:18:02 2   with the question of what type of value is being determined

11:18:07 3   here and what kind of factors are being considered.

11:18:14 4              And, you know, the dispute over whether or not a

11:18:18 5   value is numeric or not, I think defining the value as being

11:18:24 6   a cost value is certainly better than not saying anything at

11:18:27 7   all about what the value is.  So if Your Honor is inclined

11:18:32 8   to further specify that the mathematical function determines

11:18:39 9   a cost value, I think that is okay.  I'm not exactly sure

11:18:44 10  what type of value could be determined by a mathematical

11:18:49 11  function besides a numerical value, but at least cost

11:18:54 12  provides some additional meaning as to what type of value is

11:18:58 13  determined.  But the reason why again this claim should be

11:19:01 14  construed is because --

11:19:03 15             THE COURT:  What do you say to the argument that

11:19:06 16  it's really not as broad as Defendants suggest it is because

11:19:12 17  other aspects of the claims mimic it, the claims require

11:19:20 18  that the cost function be based on certain inputs, so

11:19:25 19  although in the abstract you could say yeah, it could be any

11:19:30 20  equation, as is used in the claim is not as broad as you're

11:19:37 21  suggesting.

11:19:39 22             MR. WONG:  And so, Your Honor, we actually agree

11:19:42 23  with that.  The proposed construction that Varian has

11:19:50 24  advanced we agree is reflected in the surrounding claim

11:19:56 25  language.  Now, the thing is this is the first time that we

11:19:59 1    have actually heard BMI acknowledge that.  We had prior

11:20:04 2    conversations, you know, even before the meet and confer

11:20:07 3    leading up to this hearing and that was with prior counsel

11:20:10 4    for BMI, but BMI has never said either in its meet and

11:20:15 5    confers with Varian or in the briefing that the surrounding

11:20:19 6    claim language actually imposes the requirements that

11:20:24 7    Varian's construction sets forth.  But if BMI's counsel is

11:20:28 8    now acknowledging that that is the case --

11:20:32 9              THE COURT:  Wait.  I don't think that they said

11:20:34 10   that they agree that the surrounding claim language requires

11:20:39 11   it to be iterative or to optimize a beam arrangement.  I

11:20:44 12   think they were saying yeah, it's not completely unlimited

11:20:47 13   because, for example, the objective cost function has to

11:20:50 14   include a dosimetric cost term.  It has to include an

11:20:57 15   iterative cost term.  That's different from saying sure, it

11:21:01 16   has to be iterative to optimizing a beam arrangement.

11:21:06 17              MR. WONG:  We do agree that the surrounding

11:21:09 18   claim language specifies what factors would be considered by

11:21:12 19   the objective cost function in these three terms if that is

11:21:12 20   responsive to the Court's question.

11:21:21 21              THE COURT:  I just wasn't sure if you were

11:21:23 22   saying what you agreed the claim -- you thought there was

11:21:27 23   some agreement between the parties as to the iterative and

11:21:32 24   the optimize the beam arrangement because I certainly didn't

11:21:36 25   hear that from Mr. Edwards.

11:21:38 1            MR. WONG:  Right.  And that's exactly why we are

11:21:41 2   proposing this construction, Your Honor, because BMI

11:21:44 3   apparently disagrees that that is required by this claim

11:21:47 4   term or even the claim itself.

11:21:55 5            THE COURT:  Okay.

11:21:55 6            MR. WONG:  So Mr. Martinez, if you could turn to

11:21:58 7   slide 17, please.  Actually I think we can skip this slide

11:22:02 8   because I do believe there is at least some baseline

11:22:05 9   agreement on what the construction of objective cost

11:22:08 10  function should include.  And as I mentioned, Your Honor,

11:22:12 11  saying that it's a cost value, I think Varian would be fine

11:22:15 12  with that.  And also making it clear that these are

11:22:18 13  objective factors, Varian would agree that that would be

11:22:22 14  appropriate.  So the question really is -- and Mr. Martinez,

11:22:27 15  if you could turn to slide 18.  The question really is

11:22:31 16  whether or not the phrase used, iteratively optimized beam

11:22:39 17  arrangement, should be part of the claim construction.  And

11:22:42 18  Varian believes it should be based on the intrinsic

11:22:46 19  evidence.  I take it that Your Honor has reviewed the slide,

11:22:49 20  so I won't belabor these points, but BMI's own statements to

11:22:54 21  the PTAB describing here all of the methods of the '175

11:23:00 22  Patent describe the specific cost function that is used

11:23:03 23  within the context of the '175 claims.  And it makes clear

11:23:08 24  that that cost function optimizes in an iterative fashion.

11:23:12 25  And that's also echoed by their technical expert, Dr. Chase,

11:23:22  1      in Exhibit 21 at paragraph 52.

11:23:26  2                  Mr. Martinez, next slide, please.

11:23:31  3                  And again, the intrinsic evidence also confirms

11:23:38  4      that the objective cost function is used in all of the '175

11:23:42  5      claims to optimize a beam arrangement.  I'm sorry,

11:23:48  6      Mr. Martinez, slide 19, please.  This is again taken from

11:23:54  7      BMI's filings with the PTAB and the underlying text shows

11:23:58  8      that they are discussing the cost function that is used in

11:24:01  9      all of the '175 Patent methods and they are used to optimize

11:24:06 10      a beam arrangement.

11:24:07 11                  THE COURT:  But you agree that in the PTAB, the

11:24:11 12      PTAB, nobody proposed a construction for cost function and

11:24:15 13      the PTAB didn't actually construe that term; right?

11:24:20 14                  MR. WONG:  That is correct, Your Honor.  And the

11:24:23 15      reason why this term is being raised here is because it's

11:24:27 16      being driven by BMI's infringement theories or at least what

11:24:31 17      we can discern what they are.  And just to be candid, it's

11:24:35 18      about the sort of the vague box that BMI has tried to draw

11:24:39 19      as being the objective cost function in the accused

11:24:42 20      products.  So that wasn't a dispute that the PTAB could

11:24:48 21      resolve which is why we're raising it here.

11:24:52 22                  So we can go to slide 20, Mr. Martinez.  And

11:25:01 23      aside from the comments to the PTAB, Your Honor, the

11:25:08 24      prosecution history as well as a declaration submitted by

11:25:11 25      the NOMOS founder, the NOMOS is the precursors to BMI, Mark

11:25:16 1   Carol, Mr. Carol who is also the named inventor on the Carol

11:25:20 2   patent submitted a declaration during the prosecution of the

11:25:24 3   '175 Patent explaining what the cost function in the '175

11:25:31 4   Patent does.  And again, here underlined on slide 20 of

11:25:36 5   Varian's presentation, Dr. Carol makes it clear that the

11:25:41 6   cost function determines a beam arrangement and it utilizes

11:25:46 7   an iterative optimization process.

11:25:50 8            THE COURT:  What claim -- it says talking about

11:25:53 9   application claim 19.  What claim, if any, of the final

11:25:57 10  patent is that?

11:26:00 11           MR. WONG:  I believe it is claim 19.  And I will

11:26:08 12  confirm that.  I believe that it's -- Your Honor, I

11:26:33 13  apologize, I am not sure if that claim is claim 19.  We can

11:26:49 14  -- see if I can -- Your Honor, I do not believe that that is

11:26:58 15  claim 19.  It looks like it was amended further after this.

11:27:02 16  So it is not --

11:27:04 17           THE COURT:  What I'm trying to understand is

11:27:07 18  what were the terms in that claim so that I can evaluate

11:27:11 19  your assertion that this bears on the issue in front of me?

11:27:19 20           MR. WONG:  Yes.  So that would be -- we can see

11:27:22 21  that in Exhibit 12, and maybe I think Your Honor says you

11:27:27 22  have the joint appendix.  It's Exhibit 12 in the joint

11:27:31 23  appendix, and it is at JA-148.

11:27:40 24           THE COURT:  148?

11:27:41 25           MR. WONG:  Yes.  Has Your Honor found that claim

11:28:08 1   **19?**

11:28:09 2           **THE COURT:  Yes.**

11:28:13 3           **MR. WONG:  I would note it is very similar to**

11:28:16 4   **the asserted claims at issue in this case.  It refers to**

11:28:22 5   **using a cost function for a set of a plurality of intensity**

11:28:27 6   **maps.  And it also refers to the cost function including a**

11:28:32 7   **dosimetric cost term representing dosimetric fitness of the**

11:28:37 8   **expected intensity map and the delivery cost term**

11:28:41 9   **representing delivery time.**

11:28:47 10          **And so the similarities, Your Honor -- so this**

11:28:52 11  **is not a completely separate type of claim.  The claim goes**

11:28:56 12  **to exactly what the asserted claims go to as well.**

11:29:02 13          **THE COURT:  Not exactly.**

11:29:04 14          **MR. WONG:  Not exactly, that's correct.  And**

11:29:08 15  **finally, Your Honor, I just wanted to respond -- and we**

11:29:11 16  **don't need to go over the last two slides here.  I just**

11:29:16 17  **wanted to respond to the comment that BMI's counsel made.  I**

11:29:35 18  **think someone might have muted me by mistake.  Can everyone**

11:29:40 19  **hear me?**

11:29:40 20          **THE COURT:  Yes.**

11:29:41 21          **MR. WONG:  Sorry.  I just wanted to respond to**

11:29:42 22  **BMI's counsel's comment about Varian's expert, Dr. Solberg.**

11:29:52 23  **BMI's counsel put up a statement from Dr. Solberg stating**

11:29:57 24  **that the objective cost function in the '175 claims is used**

11:30:02 25  **by the optimizer.  And that is correct.  That is sort of how**

11:30:05 1    the interplay works between the objective cost function term

11:30:10 2    and the optimizer term.  Dr. Solberg did not, however, put

11:30:14 3    forth an affirmative opinion on a construction of objective

11:30:19 4    cost function, and that is simply because there were already

11:30:22 5    declarations from Dr. Chase, who was BMI's expert, as well

11:30:28 6    as Dr. Carol that we put up here that basically defined what

11:30:35 7    the objective cost function is in the '175 claims.

11:30:41 8             And with that, Your Honor, if the Court has no

11:30:43 9    further questions, I can turn it back to BMI's counsel.

11:30:48 10            THE COURT:  Okay.  Thank you.

11:30:49 11            MR. EDWARDS:  Yes, Your Honor, a very quick

11:30:52 12   response and then we'll move on to the next claim term.  We

11:30:55 13   hear counsel for Varian -- by the way, can you hear me?  I

11:30:59 14   just want to make sure, Your Honor.

11:31:01 15            THE COURT:  I can.  Thank you.

11:31:02 16            MR. EDWARDS:  We're hearing from counsel for

11:31:06 17   Varian that their proposed construction is motivated by some

11:31:10 18   uneasiness about infringement contentions, but that's not a

11:31:14 19   basis for construing claims.  We construe claims based on

11:31:18 20   claim construction principles, primarily the intrinsic

11:31:21 21   evidence.  The intrinsic evidence that they've pointed you

11:31:25 22   to, Your Honor, is not definitional.  It's not a disavowal.

11:31:29 23   And it's not sufficient to graph these additional

11:31:32 24   limitations on to what is otherwise straightforward claim

11:31:35 25   language.  The file history excerpts that we have been

11:31:39 1     pointed to and the statement by BMI to the PTAB are general

11:31:43 2     statements, not proposals for constructions and not

11:31:47 3     definitional statements.

11:31:49 4              So with that, unless Your Honor has questions,

11:31:51 5     I'll move on the intensity math term.

11:31:55 6              MR. WONG:  Your Honor --

11:31:56 7              THE COURT:  I actually -- go ahead, Mr. Wong, go

11:31:59 8     ahead.

11:32:00 9              MR. WONG:  I didn't mean to cut you off, Your

11:32:02 10    Honor.  I just wanted to make one ten-second response to

11:32:05 11    that.  We say this in our brief and it's also on Exhibit 15

11:32:09 12    of the joint appendix.  BMI in the prior *Accuray* case had no

11:32:16 13    issues proposing a construction of objective cost function

11:32:19 14    at least for the '283 Patent that provided a detailed

11:32:23 15    description of how that cost function was used to optimize

11:32:29 16    the beam arrangement.  So I don't believe that having a

11:32:34 17    construction that reflects the intrinsic record is improper.

11:32:38 18              With that, I will submit.

11:32:39 19              THE COURT:  Okay.  I think Mr. Edwards, you said

11:32:42 20    intensity math.  I think the next term is optimizer.

11:32:50 21              MR. EDWARDS:  I misspoke.  Let's talk about

11:32:52 22    optimizer, Your Honor.  Let me get myself there.

11:32:57 23              THE COURT:  This claim I guess I do want to

11:33:00 24    understand why given everything in the intrinsic evidence

11:33:02 25    this one doesn't require some iterative attempt to find a

11:33:12 1    preferred solution.

11:33:14 2              MR. EDWARDS:  Your Honor, basically, the

11:33:19 3    intrinsic evidence doesn't amount to any disavowal or

11:33:24 4    lexicography.  And those limitations don't appear in the

11:33:29 5    claim language.  It's not sufficient to go fishing around in

11:33:34 6    all the intrinsic evidence and other things and say it must

11:33:38 7    be so.  If that were true, that would turn *Phillips* on its

11:33:42 8    head.  You have to actually find a sufficient justification

11:33:46 9    for graphing additional limitations on to a claim term.  We

11:33:51 10   don't see that here.  We see Varian pulling statements from

11:33:54 11   left and right and collecting them together to make their

11:33:58 12   case, but none of them really speak to what's required to

11:34:01 13   add additional limitations, there is --

11:34:03 14             THE COURT:  What about the statements in the

11:34:05 15   prosecution history where every time they talk about the

11:34:08 16   optimization process or even the cost function part of it,

11:34:11 17   they're talking about it being iterative.  Even what we just

11:34:16 18   saw in the declaration on that slide that Varian had up with

11:34:23 19   a declaration from the inventor, he says, you know, look,

11:34:28 20   you're finding this best value through the cost function

11:34:36 21   that's presented during the iterative optimization process.

11:34:42 22   There is no place where they talk about the process that's

11:34:45 23   not part of an iterative process.

11:34:48 24             MR. EDWARDS:  Your Honor, I would say that there

11:34:51 25   is no place where they say it must be so.  And simply

11:34:55 1  describing it as such doesn't mean that it should be so

11:34:58 2  limited in the claims.  As long as there is support for it,

11:35:02 3  then, or it's the plain and ordinary meaning --

11:35:05 4            THE COURT:  But if it's not iterative, how does

11:35:08 5  it work, just so I understand what the breadth of what

11:35:14 6  you're suggesting to me is?

11:35:16 7            MR. EDWARDS:  An optimizer is what we say it is,

11:35:19 8  it's just attempting to find a preferred solution.  If I

11:35:22 9  could point to an example to try and answer your question, I

11:35:26 10  would like to see if I could share my screen again and get

11:35:30 11  the slide up to pull up one of the claims from the '175

11:35:34 12  Patent.  If you'll bear with me for just a moment.  It is

11:35:41 13  not allowing that at the moment.  Hang on.

11:36:11 14            Can you see claim 11?

11:36:12 15            THE COURT:  Yes.

11:36:13 16            MR. EDWARDS:  I want to point out two things

11:36:14 17  that contradict --

11:36:16 18            THE COURT:  I get it, I understand your argument

11:36:18 19  that it's not an algorithm because you specified algorithm

11:36:22 20  when you meant algorithm.  Focus me on the iterative part.

11:36:26 21            MR. EDWARDS:  The iterative part is something of

11:36:28 22  Varian's making that is not supported by anything in the

11:36:31 23  intrinsic evidence that rises to a definitional statement or

11:36:35 24  to a disavowal saying --

11:36:37 25            THE COURT:  What I'm saying is the problem I

11:36:39 1    have is that every time you talk about the optimization

11:36:46 2    process in the prosecution history and you do it during this

11:36:49 3    iterative optimization process.  I'm trying to understand,

11:36:53 4    you're saying that doesn't mean that we limited it, we just

11:36:57 5    kept talking about it as the iterative optimization process.

11:37:00 6    And so what I'm trying to understand is let's say I were to

11:37:07 7    agree with you, what -- I don't even know what the breadth

11:37:11 8    of what I'm saying is.  What other kind of way of doing it

11:37:16 9    other than iteratively is there?  I'm trying to understand.

11:37:22 10         Like, if this is really an infringement issue,

11:37:27 11    tell me what's not iterative about this.  I'm not using this

11:37:31 12    for claim construction, I'm just trying to make sure I have

11:37:34 13    some understanding of the breadth of what you're asking me

11:37:40 14    to do so that I know that I feel comfortable that I can

11:37:45 15    support it.

11:37:46 16         MR. EDWARDS:  Your Honor, I can't point you to

11:37:48 17    something in the intrinsic evidence that says here is a

11:37:51 18    noniterative example.  Okay?  But that question about is it

11:37:57 19    too broad is not only a claim construction question, it's an

11:38:02 20    invalidity question that we don't have to deal with today,

11:38:05 21    Your Honor.

11:38:06 22         THE COURT:  But I still need to find some

11:38:08 23    support for saying this; right?  I have to look at the

11:38:10 24    intrinsic evidence to see if it supports what you're asking

11:38:12 25    me to do.  So that's, you know, part of why I'm asking.

11:38:17  1          MR. EDWARDS:  Okay, Your Honor.  I don't have

11:38:19  2    more of an answer than I've already given, I'm afraid.

11:38:24  3          THE COURT:  Tell me aside from the intrinsic

11:38:27  4    evidence, what other kind of way of doing this is there

11:38:30  5    other iterative?  Maybe it's extrinsic evidence.  Maybe

11:38:35  6    you're using an example from the real world.  Give me some

11:38:38  7    context so I just understand what we're talking about.

11:38:42  8          MR. EDWARDS:  I don't have an example from the

11:38:44  9    real world.  I'm afraid I don't do this --

11:38:47 10          THE COURT:  Let me ask you this.  Is the Varian

11:38:57 11    optimization process iterative?

11:38:58 12          MR. EDWARDS:  This is a public hearing and I'm

11:39:01 13    not sure we're permitted to --

11:39:03 14          THE COURT:  You're going to have to answer a

11:39:05 15    question for me.  If you can't do it, don't give me

11:39:07 16    specifics, but tell me.  I am trying to understand why is

11:39:13 17    this an issue?  Why are we fighting about it?  If you're

11:39:16 18    saying there is nothing out there that is not iterative

11:39:19 19    either in the intrinsic evidence or the extrinsic evidence,

11:39:22 20    Judge, I can't tell you anything out there that is not

11:39:25 21    iterative, then I don't understand what the fight is, so I

11:39:28 22    need to understand.

11:39:31 23          MR. EDWARDS:  So I believe that Varian's system

11:39:35 24    is iterative.

11:39:36 25          THE COURT:  Can you tell me why we're fighting

11:39:39 1   about this?

11:39:40 2              MR. EDWARDS:  I'm afraid I would ask Varian that

11:39:43 3   question because they're the ones proposing iterative.  They

11:39:47 4   have to justify adding additional limitations when they

11:39:50 5   didn't appear in the claim.  They're saying they don't have

11:39:54 6   sufficient justification under claim construction

11:39:57 7   principles.

11:39:58 8              THE COURT:  Let me ask Varian why we are

11:40:00 9   fighting about this.

11:40:02 10             MR. WONG:  This is Ryan Wong for Varian.  We're

11:40:04 11  fighting about this because of the infringement contentions,

11:40:07 12  Your Honor.  Two things, number one, they haven't clearly

11:40:10 13  identified what the optimizer is, but more concerning, Your

11:40:14 14  Honor, in terms of what they have included in what they're

11:40:18 15  accusing, there are things that are not part of any sort of

11:40:21 16  iterative optimization process.  There are things that they

11:40:27 17  have drawn the box around that would be outside of the

11:40:32 18  optimization loop.  I think optimization loop is something

11:40:36 19  the prosecution history uses as a synonym for the iterative

11:40:40 20  optimization process.  So that's our concern, Your Honor.

11:40:42 21  They have identified things that we believe are clearly

11:40:45 22  outside of any sort of optimization loop or iterative

11:40:52 23  optimization process.

11:40:54 24             THE COURT:  All right.  Let's go back and go

11:40:58 25  ahead, Mr. Edwards, you can finish your argument.

11:41:01 1          MR. EDWARDS:  I have nothing more to add, Your

11:41:03 2 Honor, on this term.

11:41:04 3          THE COURT:  All right.  Mr. Wong?

11:41:06 4          MR. WONG:  Yes, Your Honor.  And I certainly

11:41:15 5 agree with Your Honor's concern.  And Your Honor has

11:41:20 6 reviewed the prosecution history that we have briefed and

11:41:24 7 the slides, so I won't belabor that, Your Honor.  Perhaps

11:41:30 8 just the one slide I would focus on --

11:41:33 9          THE COURT:  Can you tell me, though, how am I

11:41:35 10 supposed to use that?  I mean, I'm not sure that it rises to

11:41:43 11 the level of a clear disclaimer or a definition, but I can

11:41:47 12 use it in -- you know, under *Phillips* to look at what the

11:41:54 13 patentee thought the terms meant.  Tell me how am I using

11:42:00 14 this that I'm not just reading in embodiments or I'm not

11:42:05 15 doing something that is inappropriately limiting the claim.

11:42:12 16          MR. WONG:  Yes, Your Honor.  This is two lines

11:42:15 17 of cases and two cannons of claim construction that support

11:42:18 18 Varian's construction.  The first, is under the *Gentry*

11:42:22 19 *Gallery and Ruckus Wireless* line of cases which we cite in

11:42:25 20 our brief and those cases stand for the proposition that a

11:42:29 21 claim can be no broader than the supporting disclosures.

11:42:32 22 And as Mr. Edwards noted, there is no way to do what the

11:42:39 23 so-called optimizer does unless it is iterative.

11:42:44 24          And in addition, all of the embodiments -- it's

11:42:49 25 not a preferred embodiment.  All of the embodiments of the

optimizer in the intrinsic record say that it has to be an
iterative optimization process.  So the *Gentry Gallery and
Ruckus Wireless* line of cases alone would support adopting
Varian's construction.

In addition to that, Your Honor, the line of
cases that we also cite, that's the *Board of Regents v.
University of Texas* -- I'm sorry, *Board of Regents of the
University of Texas v. BENQ*, that line of cases talk about
statements that a patentee makes during the prosecution of a
patent where a claim term is given certain meaning to
overcome prior art, and that's exactly what has happened
here.  And importantly, Your Honor, that *BENQ* case, B-E-N-Q,
focuses on when a claim term has been added to the claims
and pointed to as a purported point of novelty.  And the
optimizer was added to claims at the same time the patentee
made this argument to try to distinguish this claim over
*Pirzkoll*, P-I-R-Z-K-O-L-L.  And as shown on slide 26,
Mr. Martinez, of Varian, the patentee argued that the claims
were distinct from the *Pirzkoll* prior art reference because
of its improvements to the optimization loop performed by
the optimizer.  And the optimizer was added to the claims as
part of that.  So that is part of the problem with BMI's
construction is that it basically turns optimizer into a
complete nonlimitation because under their construction they
could simply point to the linear accelerator machine and say

11:44:58 1    ha, that's the optimizer, whereas in the file history they

11:45:01 2    argued that mechanical improvements are what discontinuing

11:45:06 3    these claims over the *Pirzkoll* reference, but it's actually

11:45:10 4    these improvements within the optimization loop performed by

11:45:15 5    the optimizer.

11:45:16 6            Because of these statements and because they

11:45:18 7    point to the optimizer as a point of novelty and add it to

11:45:22 8    the claims at the same time they made these arguments the

11:45:25 9    *BENQ* line of cases supported in our briefing would support

11:45:30 10   adopting Varian's proposed construction.

11:45:34 11           THE COURT:  Okay.

11:45:38 12           MR. WONG:  I don't think I have anything else to

11:45:39 13   add to my argument, Your Honor, unless Your Honor has any

11:45:42 14   questions.

11:45:43 15           THE COURT:  Nope.

11:45:55 16           Mr. Edwards.

11:45:55 17           MR. EDWARDS:  Yes, Your Honor.  We can move on

11:45:57 18   to intensity map.  Let me again attempt to share my screen.

11:46:24 19   So Your Honor can hear me?

11:46:25 20           THE COURT:  Yes, I can hear you and I can see

11:46:28 21   your screen.  I got to tell you on this one, I really don't

11:46:31 22   understand what the dispute is because you did suggest in

11:46:36 23   your papers that you deal with this from -- at a gantry

11:46:44 24   angle.  So this one again I don't understand what the

11:46:50 25   problem is, why we're having a dispute that is actually a

11:46:56 1    meaningful dispute as opposed to well we just don't really

11:47:00 2    like the words.

11:47:01 3                THE EDWARDS:  Well, Your Honor, our proposed

11:47:02 4    construction is the plain and ordinary meaning as found by

11:47:08 5    the PTAB.

11:47:10 6                THE COURT:  But isn't the intensity map done at

11:47:16 7    from a single gantry angle?  You said that in describing the

11:47:20 8    background of how these things work.  So that's where I'm

11:47:23 9    just not sure I understand, why am I spending my time on

11:47:28 10   this when it seems like what they're saying is factually

11:47:34 11   correct?

11:47:35 12               MR. EDWARDS:  Well, I believe the normal way to

11:47:40 13   do it is at a particular gantry angle, but that is not

11:47:44 14   necessarily the only way.  And the claims do not require

11:47:48 15   that to be the only way.

11:47:49 16               THE COURT:  And do the claims add enough support

11:47:52 17   to do it from some other way other than from a gantry angle?

11:47:57 18   Are you going to have some enablement issues?  Are you

11:48:01 19   saying yeah, you can do it from multiple angles?  I don't

11:48:04 20   even know what you're saying.  Are we then going to get into

11:48:08 21   additional 112 arguments on the written description

11:48:11 22   enablement because you're saying something that is maybe

11:48:15 23   hypothetically possible, but has no actual bearing in this

11:48:19 24   case?

11:48:20 25               MR. EDWARDS:  We don't know whether Varian will

11:48:22 1   raise that as an invalidity issue, so it's hard for me to

11:48:27 2   speak to that.   I do think the example that Your Honor just

11:48:31 3   provided speaks to why the PTAB made this decision at a

11:48:41 4   single gantry angle.   It feels gratuitous coming from Varian

11:48:46 5   now to tack this on now to their prior construction.   They

11:48:50 6   have abandoned the dose distribution thing, and now they're

11:48:54 7   sort of siding up to the PTAB construction but then tacking

11:48:58 8   this additional piece on.

11:49:00 9          Frankly, when they were talking about to the

11:49:02 10  PTAB about what's the plain and ordinary meaning of this,

11:49:05 11  they said nothing about it being at a particular gantry

11:49:08 12  angle.   We can look in the PTAB decision at what they said.

11:49:12 13  They are talking about it being at a single beam and here in

11:49:16 14  slide 136 is a pullout from the institution decision talking

11:49:22 15  about Dr. Solberg, and what he said.   He's talking about it

11:49:25 16  being a single beam, but he's not going out of his way to

11:49:29 17  talk about it being from a single gantry angle.   And it

11:49:33 18  feels to us like the burden on Varian to really testify why

11:49:39 19  they want to tack this additional limitation on.   The plain

11:49:42 20  and ordinary meaning as construed as we are offering is what

11:49:47 21  the PTAB has concluded.   And we think it's the right one.

11:49:51 22  We don't think further adornment is necessary.   If there is

11:49:55 23  going to be some sort of 112 issue down the road, that's up

11:49:59 24  to Varian, and that's a different burden of proof, et

11:50:06 25  cetera.

11:50:06  1          THE COURT:  All right.

11:50:08  2          MR. EDWARDS:  Just to touch on Varian's

11:50:11  3  alternative dose distribution construction, they may have

11:50:15  4  abandoned it by now, but they kept it in as an alternative

11:50:19  5  at least up until now.  The same reasoning applies, the PTAB

11:50:26  6  considered those exact same arguments and rejected them.

11:50:30  7  It's now, again, this is intrinsic evidence that this is the

11:50:34  8  proper construction of this claim, and when you're

11:50:37  9  confronted with intrinsic evidence that is directly on

11:50:41 10  point, it is hard to overcome that with statements that

11:50:47 11  aren't otherwise definitional or clear disavowals under the

11:50:53 12  *Phillips* standards, under standard claim construction

11:50:56 13  principles.  So we think our construction is the correct

11:51:01 14  one, the PTAB agreed, and we think that's the one the Court

11:51:04 15  should go with without the additional gantry angle

11:51:08 16  limitation.

11:51:12 17          THE COURT:  Okay.

11:51:13 18          MR. EDWARDS:  With that I will turn it over.  I

11:51:15 19  don't have anymore to add from the briefs than that.

11:51:17 20          THE COURT:  Mr. Wong?

11:51:18 21          MR. WONG:  Yes.  I take it Your Honor does not

11:51:21 22  have any advanced questions for me?

11:51:23 23          THE COURT:  I do not.  Thank you.

11:51:25 24          MR. WONG:  Okay.  Your Honor, I do want to

11:51:27 25  clarify that we have not abandoned the alternative

construction.  And I'm not going to spend any time actually
arguing it, but I want to make it clear that the reasons why
we proffered that alternative construction or an original
construction, representations of dose distribution is
because the claims don't make sense if intensity map is
given its customary meaning.  However, to try to narrow
disputes for claim construction and basically postpone our
arguments about the nonsensical nature of these claims to an
invalidity defense under Section 112, we worked with BMI to
try to narrow this for the Court for claim construction.

         So that's -- I just want to make it clear that
Varian hasn't abandoned its original construction, but we
are sort of trying to find the path of least resistance
while preserving our 112 arrangements under the customary
construction.

         Turning now to the dispute over the customary
construction, you know, we believe and I think BMI also
agrees because they said it in their briefing in the *Electa*
case, slide 35, in the *Electa* case that each intensity map
is representative of radiation to be delivered from a single
gantry angle.  And that shouldn't be a factual dispute, that
is a fact.  And their own expert, slide 36, please,
Mr. Martinez, and their own expert also confirms, Dr. Chase,
that each intensity map is associated with a single beam at
particular gantry angles.

11:53:36 1          And I also want to point out BMI's counsel sort

11:53:40 2     of implied that Varian's expert, Dr. Solberg, didn't touch

11:53:47 3     upon the gantry angle point and simply said single beam, but

11:53:53 4     that's actually not correct.  In Dr. Solberg's actual

11:53:57 5     declaration in paragraph 45, he did make it clear that each

11:54:03 6     intensity map is associated with a given number of fixed

11:54:07 7     beam positions which is also what he says in the declaration

11:54:14 8     supporting Varian's claim construction brief here.  And

11:54:18 9     that's at paragraph 49 of Exhibit 29 of the joint appendix,

11:54:23 10    that's Dr. Solberg's declaration.

11:54:28 11         So also with the PTAB, Dr. Solberg made it clear

11:54:34 12    that when he meant single beam, that he meant that that

11:54:37 13    meant from a single beam position.  And what he said in the

11:54:41 14    PTAB declaration is the same as what he says here.  So there

11:54:47 15    is no inconsistency there is my point.

11:54:51 16         So we believe that this clarification that an

11:54:57 17    intensity map represents variation across a defined area of

11:55:03 18    radiation of a single beam from a single gantry angle is

11:55:07 19    correct, and there is really no factual dispute that that is

11:55:11 20    correct.

11:55:14 21         And with that I'll submit.

11:55:14 22         THE COURT:  Okay.  Fifth and final term.

11:55:34 23    Mr. Edwards?

11:55:35 24         MR. EDWARDS:  Yes, Your Honor.  Can you hear me?

11:55:36 25         THE COURT:  Yes.

11:55:37  1            MR. EDWARDS:  Can you see my slide for the '490

11:55:42  2    Patent on the screen?

11:55:43  3            THE COURT:  I can.  Thank you.

11:55:44  4            MR. EDWARDS:  Okay.  There is basically one

11:55:47  5    dispute going on here.  Our position is there is really no

11:55:52  6    basis in the intrinsic evidence to tack on the gantry angle

11:55:58  7    limitations here either.  I think there is not much that I

11:56:03  8    wish to add to the briefs except I did notice one thing, and

11:56:07  9    if you'll look with me at claim 10.

11:56:10 10            THE COURT:  I already noticed that.  I was going

11:56:12 11    to ask you about that.  Actually, I was going to ask Varian

11:56:16 12    about that.  Doesn't that suggest that if they meant to say

11:56:19 13    at a particular radiation beam delivery angle or gantry

11:56:23 14    angle, you knew how to say it?

11:56:26 15            MR. WONG:  Sorry, Jeremy.

11:56:29 16            MR. EDWARDS:  Your Honor, that's of course my

11:56:32 17    point and are you asking that of Varian right now?

11:56:35 18            THE COURT:  No, I was going to ask if that was

11:56:37 19    the point you were about to make and then to assure you that

11:56:41 20    I was going to ask it of Varian.

11:56:42 21            MR. EDWARDS:  Yes, thank you.  You made my

11:56:46 22    point.  You understand it.  I won't belabor it.  The other

11:56:48 23    thing I want to add is it seems like this proposed

11:56:51 24    construction by Varian is moot.  The parties agree that

11:57:01 25    collimator angle and gantry angle are different things.  And

11:57:06 1   Varian trying to add a clarification in its proposed

11:57:10 2   construction doesn't exist anymore.  They said they thought

11:57:13 3   we were connoting these two different angles and it's clear

11:57:18 4   that we're not.  I'm not sure why they're still advocating

11:57:22 5   for it.

11:57:22 6            THE COURT:  Let me ask you a question because I

11:57:24 7   was trying to figure out, I was trying to figure out what

11:57:28 8   the issue was here when I was reading through the papers,

11:57:32 9   and I guess my question was, are you saying that if the

11:57:39 10  collimator angle never changes, let's say you cannot change

11:57:43 11  the collimator angle, but you change something else like the

11:57:47 12  gantry angle or the leaf positions to adjust the beams,

11:57:52 13  would that fall into determining a collimator angle in the

11:57:57 14  claims?

11:57:58 15           MR. EDWARDS:  Let me make sure I understood the

11:58:00 16  question before I answer it.  You're asking if you leave the

11:58:03 17  collimator alone--

11:58:05 18           THE COURT:  Let's say the collimator does not

11:58:07 19  move and you know, so yeah, it can either be you leave it

11:58:12 20  alone or you couldn't move it even if you wanted to, the

11:58:15 21  angle of it you can't move, but you can change the gantry

11:58:20 22  angle or the leaf position to adjust the beam, does that

11:58:23 23  fall within the determining the collimator angle as you read

11:58:26 24  it?

11:58:26 25           MR. EDWARDS:  Well, moving these things is

11:58:30 1    different than determining the angle at whatever point in

11:58:35 2    the process you're determining it.  But to your point, I

11:58:40 3    think what you're asking, the collimator doesn't rotate or

11:58:44 4    change the collimator angle, but it stays fixed with respect

11:58:48 5    to collimator angle and the gantry moves.  Is that

11:58:52 6    tantamount to determining or adjusting the collimator angle?

11:58:58 7                   THE COURT:  Yes.

11:59:03 8                   MR. EDWARDS:  The answer is no, you're moving

11:59:05 9    the gantry.  Now the beam's eye view will be different

11:59:11 10   depending on the gantry angle.  The angle of attack for the

11:59:17 11   collimator leaf pairs is what changes when you change the

11:59:21 12   collimator angle.  I'm hoping that answers your question

11:59:25 13   that merely by adjusting the gantry angle doesn't nearly

11:59:32 14   translate to adjusting the collimator angle.

11:59:34 15                  THE COURT:  Okay.  And then in your proposal you

11:59:42 16   changed the word "angle" to "position."  Do we need that

11:59:48 17   changed?

11:59:49 18                  MR. EDWARDS:  That's a nonissue, Your Honor.  We

11:59:51 19   don't think there is any disagreement about those two terms.

11:59:55 20   I don't think it was briefed as something that was a point

11:59:58 21   of contention.  I think it was a word choice that doesn't

12:00:04 22   need to be hashed out one way or the other.

12:00:07 23                  THE COURT:  Okay.

12:00:12 24                  So Mr. Wong, based on what you just heard, do we

12:00:16 25   really have a disagreement on this term?

12:00:18 1          MR. WONG:  Actually, Your Honor, I am leaning to

12:00:22 2     say no because Your Honor actually asked the question that

12:00:25 3     really gets to the heart of Varian's concern which is if you

12:00:34 4     know optimizing or making changes to the gantry is going to

12:00:38 5     be something that BMI is going to say well, you're sort of

12:00:42 6     changing the collimator angle at that point, so we can point

12:00:45 7     the gantry angle optimizations for these claims, which you

12:00:51 8     know, just to be frank, some aspects of their infringement

12:00:55 9     contentions do just that.  And that was the motivation for

12:00:58 10    this construction, to make it clear that BMI couldn't try to

12:01:04 11    look at gantry angle techniques and basically say well,

12:01:09 12    because the collimator is moving, the collimator angle is

12:01:14 13    being changed.  Now I have heard BMI say that those two are

12:01:18 14    completely different and when you change or do anything with

12:01:22 15    the gantry angle, that is not the same thing as optimizing a

12:01:29 16    collimator angle.  If BMI -- if that is BMI's position, then

12:01:32 17    I actually agree that this is probably moot.  But that was

12:01:34 18    the motivating concern.

12:01:40 19         THE COURT:  So let me just make sure I

12:01:42 20    understand.  Mr. Edwards, it seemed like you said everyone

12:01:46 21    agrees that the gantry angle is different from the

12:01:52 22    collimator angle and that changing the gantry angle is not

12:01:56 23    the same as changing or selecting the collimator angle.  Is

12:02:01 24    that correct?

12:02:02 25         MR. EDWARDS:  Yes, Your Honor.

12:02:04 1          THE COURT:  Okay.  So I think that if we have

12:02:06 2     that agreement, then do we also have an agreement that we

12:02:10 3     don't need to construe this term or at least that we

12:02:14 4     certainly don't need to construe it to add on the additional

12:02:18 5     language at a particular gantry angle that the Defendants

12:02:22 6     have proposed?

12:02:23 7          MR. WONG:  Your Honor, speaking for Varian, I

12:02:26 8     think we will be fine with that.  However, I will say that

12:02:29 9     just to reserve the possibility that this might pop up in an

12:02:33 10    infringement dispute, if it looks down the road that BMI is

12:02:40 11    trying to point to optimization techniques towards the

12:02:47 12    gantry angle and trying to conflate the two, this issue may

12:02:51 13    pop up again.  That might be an infringement issue or a

12:02:55 14    claim construction issue.  It sort of straddles the two.

12:02:58 15         THE COURT:  All right.  Sounds to me like it

12:03:00 16    would probably be an issue of infringement and whether or

12:03:06 17    not there is a change being made.  But in any event, I take

12:03:12 18    your point.  I'm going to assume that we have agreement that

12:03:15 19    this term means less a rotational angle of the multi-leaf

12:03:20 20    collimator and to the extent that an issue arises down the

12:03:30 21    line, I will trust the parties to bring it to my attention.

12:03:33 22         MR. WONG:  Thank you, Your Honor.

12:03:33 23         MR. EDWARDS:  Thank you, Your Honor.

12:03:37 24         THE COURT:  Okay.  So I do want to hear from the

12:03:41 25    parties on the motion to dismiss and the motion to stay, but

12:03:50 1    I would like to go back, there is a couple of cases that

12:03:54 2    have been cited that we would like to read and see if I can

12:03:59 3    address the remaining claim terms before we get to those

12:04:07 4    motions.  So what I would like to do is take a break now,

12:04:10 5    get off the call.  I will try to get everything that we need

12:04:16 6    to look at done by 12:45 or so, so I will ask you all to get

12:04:22 7    back on the line around 12:45, and we will get back on as

12:04:28 8    soon after that as we are able.  And then after we deal with

12:04:33 9    the claim construction issues, I'll hear from the parties on

12:04:36 10   the motion to dismiss and the motion to stay.  Any questions

12:04:41 11   about that?

12:04:44 12            MR. LAM:  Yes, Your Honor.  This is Lee Lam for

12:04:46 13   the Defendant, Varian parties.  Your Honor raised a question

12:04:49 14   that was prompted by an argument that BMI counsel made today

12:04:53 15   about computer terminology, whether it's being used

12:04:56 16   consistently in the claims.  This wasn't in the briefing,

12:04:59 17   but we have since scoured the cases we have already cited.

12:05:04 18   I want to bring one case to Your Honor.  This was cited at

12:05:07 19   our joint brief on page 40 of the joint brief, it's an

12:05:11 20   Eastern District of Texas case called *St. Isidor Research v.*

12:05:25 21   *Comerica.*  The Westlaw citation is 2016 W L4988246.  In that

12:05:39 22   case, Your Honor, which we previously cited, but not for the

12:05:43 23   proposition that Your Honor inquired about earlier today, in

12:05:47 24   response to which I said Your Honor that logically speaking

12:05:52 25   within the same claim, of course the same term has to be

12:05:55 1    construed consistently.  In this instance, in the

12:05:59 2    *St. Isidore* instance, I'll give Your Honor the pincite, it's

12:06:03 3    asterisk, per the Westlaw case citation, Your Honor.

12:06:08 4                    THE COURT:  I see it, 14.

12:06:10 5                    MR. LAM:  Let me just share my screen and I'll

12:06:13 6    show you because I don't want to give the page number

12:06:23 7    incorrect.  Can Your Honor see what we've highlighted here

12:06:29 8    in the *St. Isidore* case?

12:06:32 9                    THE COURT:  Yes.

12:06:33 10                   MR. LAM:  So what we've highlighted here is

12:06:35 11   apparently at least the Eastern District of Texas court left

12:06:39 12   room for specific purpose treatment of the same claim term.

12:06:47 13   In that instance the term was processor, and here you have

12:06:50 14   the court saying that in most instances, depends on the

12:06:55 15   functional recitation, the processor term by itself was

12:06:59 16   fine.  But in other instances where the recited function was

12:07:03 17   more specific, the processor term by itself wasn't.  So

12:07:09 18   apparently at least one court has treated the same term for

12:07:18 19   specific purposes and that is bared on that court's decision

12:07:24 20   whether or not to apply *Williamson* and Section 112(6).

12:07:26 21                   THE COURT:  Okay.  We will take a look at that

12:07:31 22   further as well.

12:07:33 23                   MR. LAM:  Thank you, Your Honor.

12:07:35 24                   THE COURT:  All right.  And thank you for

12:07:38 25   pointing that out.  So we'll take a break.  We'll come back

12:07:43 1    at close to 12:45 as we are able.  Thanks very much.

12:07:49 2                    (A brief recess was taken.)

12:48:27 3                    THE COURT:  Can you hear me now?

12:48:32 4                    MR. EDWARDS:  Yes, Your Honor, I can hear you.

12:48:34 5                    THE COURT:  Thanks, everyone.  Thank you for

12:48:38 6    getting back on the line promptly and thank you for the

12:48:41 7    arguments that you made today.

12:48:50 8                    At issue in this case, we have four patents and,

12:48:52 9    after the argument, we have four terms in dispute.  I am

12:48:57 10    prepared to rule on each of those disputes today.  I will

12:48:58 11    not be issuing a written opinion, but I will issue an order

12:49:02 12    stating my rulings.  I want to emphasize before I announce

12:49:02 13    my decisions that, although I am not issuing a written

12:49:06 14    opinion, we have followed a full and thorough process before

12:49:09 15    making the decisions I am about to state.  I have reviewed

12:49:13 16    the '283, '096, '490 and '175 Patents, and the portions of

12:49:20 17    the prosecution history and the IPR, as well as the other

12:49:23 18    materials, in the joint appendices, including expert

12:49:27 19    declarations.  Both sides submitted tutorials about the

12:49:30 20    technology at issue.  There was full briefing on the

12:49:34 21    disputed issues and there has been argument here today.  All

12:49:37 22    of that has been carefully considered.

12:49:40 23                    Now, as to my rulings.  I am not going to read

12:49:44 24    into the record my understanding of claim construction law.

12:49:46 25    I have a legal standard section that I have used earlier,

12:49:50 1    including in my relatively recent order in *Quest Diagnostics*

12:49:56 2    *Investments LLC v. Laboratory Corporation of America*

12:50:01 3    *Holdings,* C.A. No. 18-1436(MN).  I incorporate that law and

12:50:05 4    adopt it into my ruling today and I will also set it out in

12:50:09 5    the order that I issue.

12:50:10 6            As to the person of ordinary skill in the art,

12:51:09 7    there are slight differences in the proposals but there has

12:51:13 8    not been any argument that proposed differences in who that

12:51:17 9    person may be are relevant to claim construction.

12:51:22 10           The first disputed term is "computer . . . to

12:51:25 11   computationally" obtain, change, or calculate specified

12:51:31 12   aspects of the radiation beam arrangement or weights found

12:51:36 13   in various claims of the '283 and '096 Patents.  Plaintiff

12:51:41 14   proposes that the term "computer" should have its plain and

12:51:44 15   ordinary meaning or, if a construction is required, that it

12:51:48 16   means "a programmable electronic device that can store,

12:51:52 17   retrieve, and process data."  Defendants assert that the

12:51:56 18   word "computer" should be construed pursuant to 35 U.S.C.

12:52:01 19   § 112, ¶ 6  and then propose structures and functions for

12:52:06 20   each of the variations of the term.

12:52:06 21           Here, I agree with Plaintiff and conclude that

12:52:10 22   the "computer" terms are not subject to § 112, ¶ 6.  First,

12:52:15 23   I note that there is a rebuttable presumption that § 112,

12:52:20 24   ¶ 6 does not apply in situations where, as here, the word

12:52:25 25   "means" is absent from the claim term at issue.  That

presumption may be overcome if Defendants "demonstrate[]
that the claim term fails to recite sufficiently definite
structure" or if they demonstrate that the claim "recites
function without sufficient structure for performing that
function."  Defendants have failed to make that showing.

The inquiry here is whether the "computer"
recited in the claims of the '283 and '096 Patents connotes
sufficiently definite structure to a person of ordinary
skill in the art.  "That determination must be made under
the traditional claim construction principles, on an
element-by-element basis, and in light of evidence intrinsic
and extrinsic to the asserted patents."

Here, the term "computer" as used in the claims
is sometimes followed by functional language and sometimes
not.  There is no argument that the computer is a different
computer at different points.  And there has been no Federal
Circuit case law cited to support the argument that the
references to "computer" when it is not followed by
functional language are subject to § 112, ¶ 6 or that such a
"computer" is transformed into one subject to § 112, ¶ 6
when the computer is later given a function.

In addition, I find that there is sufficiently
definite structure for the claims to avoid being subject to
§ 112, ¶ 6.  In the claims themselves, there are references
to "partial volume data . . . entered directly into the

12:54:14 1    computer," data "graphically entered into the computer using

12:54:19 2    a pointing device," "entering the desired partial volume

12:54:25 3    data into a computer," and "a conformal radiation therapy

12:54:29 4    apparatus in communication with the computer."

12:54:32 5            These references suggest components connected to

12:54:35 6    or communicating with the computer, and evidence the

12:54:40 7    structural nature of the computer.

12:54:44 8            The specification also provides examples of

12:54:47 9    physical structures for the claimed computer.  For example,

12:54:50 10    the '096 Patent refers to a "conventional computer or set of

12:54:54 11    computers" and also states that a "suitable computer is

12:54:58 12    utilized" and gives as an example a "programmable 150 Mhz

12:55:07 13    pentium computer with four symmetric multiprocessors,

12:55:12 14    running the Sun Solaris Operating System, and having

12:55:18 15    256 megabytes RAM."

12:55:19 16            And, finally, although not dispositive, I note

12:55:21 17    that in its decision to institute review of the '096 Patent,

12:55:26 18    the PTAB did not apply § 112, ¶ 6 to the term "computer" in

12:55:32 19    the claims addressed, agreeing that "an ordinarily skilled

12:55:35 20    artisan would have readily understood what a computer is."

12:55:39 21            Thus, I will construe the "computer . . . to

12:55:41 22    computationally" obtain, change, or calculate specified

12:55:45 23    aspects of the radiation beam terms in the claims of the

12:55:49 24    '283 and '096 Patents to have its plain and ordinary

12:55:52 25    meaning.

12:55:53 1      The second disputed term is "objective cost

12:55:56 2  function" in claims 13, 15, and 19 of the '175 Patent.

12:56:02 3  Plaintiff asserts that the term has its plain and ordinary

12:56:05 4  meaning, which is "mathematical function that determines a

12:56:09 5  value based upon factors."  Defendants propose that it means

12:56:13 6  "mathematical function that determines a numerical value

12:56:18 7  based on factors used to iteratively optimize a beam

12:56:23 8  arrangement."

12:56:23 9      The crux of the dispute is whether the value

12:56:27 10  determined must be "numerical" and whether the mathematical

12:56:31 11  function in question must be based on factors used to

12:56:34 12  iteratively optimize a beam arrangement.

12:56:37 13      Here, I will construe the term to mean a

12:56:40 14  "mathematical function that determines a cost value based

12:56:44 15  upon objective factors."

12:56:46 16      This is consistent with the ordinary meaning of

12:56:49 17  the words themselves as understood by persons of skill in

12:56:52 18  the art as we have seen in the declarations submitted.

12:56:57 19      This construction is also supported by the

12:57:01 20  intrinsic evidence.  The claims of the '175 Patent,

12:57:04 21  including asserted claim 19, use the word "value" and

12:57:07 22  correlate that "value" with cost.  Additionally, the '096

12:57:12 23  Patent, which is incorporated into the '175 Patent by

12:57:16 24  reference, states that "[e]xisting methods and apparatus

12:57:21 25  utilize a computational method of establishing optimized

treatment plans based on an objective cost function that
attributes costs of radiation of various portions of both
the tumor and surrounding tissues, or structures."

I will not include in the construction the
additional language proposed by Defendants.  With the
addition of that language, it appears that Defendants go
beyond what the claimed objective cost function is to
describe what the cost function is used for and how it is
used.

Defendants assert that Plaintiff's construction
is so broad as to describe any mathematical equation.  As
used in the claims, however, the objective cost function is
not so unlimited.  For example, the asserted claims require
that the objective cost function include a "dosimetric cost
term and the delivery cost term."  All of the parties agree
to that.

Defendants rely on Plaintiff's statements
opposing institution of IPR.  The statements that Defendants
point to, however, generally discuss the claims and the
patent.  The statements do not clearly define what a cost
function is.  And indeed, in connection with the petition
for IPR, the cost function term was never defined.

Defendants also rely on a declaration from the
inventor Carol during prosecution of the '175 Patent.  I do
not view those statements as clearly defining a cost

12:59:00 1   function to iteratively optimize a beam arrangement.  The

12:59:06 2   statements do not say that the cost function itself is

12:59:09 3   iterative; rather, they focus on the process.

12:59:21 4          Finally, Defendants' citations to the

12:59:23 5   specification are generally citations to embodiments of the

12:59:27 6   invention rather than a definition of the invention.  The

12:59:30 7   Federal Circuit has cautioned against reading embodiments in

12:59:33 8   the specification into the claims.  I will heed that

12:59:36 9   caution.

12:59:36 10          The third disputed term is "optimizer" also in

12:59:40 11   claims 13, 15, and 19 of the '175 Patent.  Plaintiff

12:59:45 12   proposes that the word should be given its plain and

12:59:48 13   ordinary meaning or, if a construction is required, that it

12:59:51 14   means "program or device that attempts to find a preferred

12:59:54 15   solution."  Defendants propose the construction "iterative

13:00:01 16   optimization algorithm."

13:00:03 17          Here, I will construe "optimizer" to mean a

13:00:06 18   "program or device that iteratively attempts to find a

13:00:09 19   preferred solution."

13:00:11 20          This, again, is supported by the intrinsic

13:00:14 21   evidence, which only ever addresses optimization as being

13:00:16 22   iterative.  For example, at column 9, beginning at line 29,

13:00:23 23   the '283 Patent, which is incorporated by reference into the

13:00:26 24   '175 Patent, states:  "The optimizer of the present

13:00:32 25   invention computes an optimized treatment plan, or beam

arrangement . . . .   The optimal beam arrangement is arrived at by computationally increasing the proposed beam weight iteratively . . . ."

Similarly, during prosecution of the '175 Patent, the patentee described the delivery cost term as being "used by the optimizer to evaluate each potential intensity pattern to thereby determine the optima (best value) of the objective function to determine a beam arrangement . . . to be presented to the clinician during the iterative optimization process."

The patentee also referred to the "optimizer" as "the optimization loop" that "optimize[s] a radiation treatment plan," further confirming the iterative operation of the optimizer.  And the patentee amended the claims to include the term "optimizer" in order to distinguish the prior art during prosecution, and successfully argued that the '175 invention pertains to "improvements within the optimization loop . . . performed by the optimizer" and not "mechanical improvements."

In recent filings, Plaintiff also referenced the iterative nature of the optimizer, stating that the '175 invention "utilize[s] a cost function that considers[,] at each iteration of an optimizer," both dosimetric fitness and delivery efficiency.

I will not limit the "optimizer" claimed to an

13:02:12 1   algorithm.  Certain claims, such as claim 11, specifically

13:02:16 2   reference optimization algorithms.  And thus it appears that

13:02:20 3   when the patentee meant for the optimizer to be an

13:02:24 4   algorithm, he stated that.  He did not do so in the claims

13:02:26 5   at issue here.

13:02:27 6        I also note that limiting the optimizer to an

13:02:32 7   algorithm is not supported by the specification.  Indeed, in

13:02:36 8   the Summary of the Invention, it refers to three methods for

13:02:38 9   enabling user control of the tradeoff between dosimetric

13:02:43 10  fitness and delivery efficiency.  Each of those references

13:02:45 11  optimization, but only one - the third - references choosing

13:02:48 12  an optimization algorithm.

13:02:51 13       The fourth disputed term is "intensity map[s]"

13:02:55 14  again in claims 13, 15, and 19 of the '175 Patent.

13:03:00 15  Plaintiff proposes this term means "a representation of the

13:03:03 16  variation across a defined area of radiation of a single

13:03:08 17  beam."  Defendants originally proposed the construction

13:03:11 18  "representation[s] of dose distribution."  But during

13:03:15 19  discussions aimed at narrowing the disputes, Defendants

13:03:18 20  proposed the construction "a representation of the variation

13:03:22 21  across a defined area of radiation of a single beam from a

13:03:28 22  single gantry angle," thus adopting Plaintiff's construction

13:03:33 23  with the addition of the words "from a single gantry angle."

13:03:39 24       Here, I agree with Plaintiff and will construe

13:03:42 25  the term to mean "a representation of the variation across a

13:03:46 1    defined area of radiation of a single beam."

13:03:49 2             This is consistent with the ordinary meaning of

13:03:51 3    the term as recognized by the PTAB in denying the petition

13:03:55 4    to institute IPR.

13:03:57 5             Defendants have not cited anything in the

13:03:59 6    specification, claims, or prosecution history that clearly

13:04:03 7    requires that the language "from a single gantry angle" be

13:04:07 8    added to the ordinary meaning.

13:04:09 9             The fifth and final disputed term is "determine

13:04:15 10   [a/the] collimator angle of [a/the] multileaf collimator" in

13:04:20 11   claims 4, 17, and 18 of the '490 Patent.  During the hearing

13:04:24 12   the parties reached agreement that this term means "select

13:04:32 13   [a/the] rotation angle of [a/the] multileaf collimator."

13:04:36 14   And in coming to that agreement, both sides agreed that a

13:04:38 15   gantry angle is different from a collimator angle and that

13:04:42 16   changing the gantry angle is not the same as changing the

13:04:45 17   collimator angle.

13:04:47 18            So with that, I believe that addresses the

13:04:50 19   issues we had for claim construction for today.

13:04:52 20            Are there any questions about that?

13:04:52 21            MR. EDWARDS:  Not from Plaintiff, Your Honor.

13:05:02 22            THE COURT:  All right.  Thank you.  So now I

13:05:02 23   would briefly like to hear on the motion -- let me hear on

13:05:11 24   the motion to stay first.  Who is going to handle that for

13:05:21 25   the defendant?

13:05:25  1        MS. ALLEN:  Good morning, Your Honor.  Julia

13:05:28  2   Allen on behalf of the Varian defendants.

13:05:30  3        THE COURT:  Okay.

13:05:31  4        MS. ALLEN:  Varian ask that the Court grant its

13:05:34  5   motions to stay in its entirety because this case is now at

13:05:36  6   a natural pausing point and a stay pending *inter partes*

13:05:41  7   review will conserve the parties' and the Court's time and

13:05:45  8   resources while creating no undue prejudice to BMI or any

13:05:50  9   unfair advantage to Varian.  In considering this motion,

13:05:53 10   it's important that the Court keep the history and context

13:05:57 11   of this case in mind.

13:05:59 12        This is a case where BMI waited years and years

13:06:03 13   to assert the patents-in-suit such that two patents are now

13:06:06 14   expired and over seventy percent of the asserted claims in

13:06:12 15   this case are in those expired patents.  This is also a case

13:06:16 16   where BMI and Varian are not direct competitors.  On top of

13:06:21 17   all of that, the most burdensome aspects of this case remain

13:06:26 18   ahead and there is substantial overlap between two of the

13:06:29 19   patents that are not subject to IPR proceedings and the '096

13:06:34 20   Patent for which the IPR proceedings have been instituted.

13:06:40 21        I will walk through the three factors that

13:06:42 22   courts consider in determining whether to exercise

13:06:44 23   discretion to stay a case pending IPR to show why a stay is

13:06:49 24   merited here unless the Court would like me to address any

13:06:52 25   specific issues or questions first.

13:06:54  1                    THE COURT:  No, that sounds good to me.

13:06:57  2                    MS. ALLEN:  Thank you.

13:06:58  3                    First, a stay pending IPR will allow for

13:07:03  4      simplification of the issues in this case.

13:07:06  5      Twenty-seven percent of the claims asserted here are

13:07:09  6      challenged in the instituted '490 and '096 IPR proceedings.

13:07:15  7      Courts have stayed cases involving even less overlap than

13:07:20  8      exist here.  And because of the substantial overlap between

13:07:23  9      the '096 and the '283 and '175 Patents, the PTAB's expert

13:07:30  10     analysis and the instituted '096 IPR proceedings will help

13:07:35  11     simplify the issues before this Court.

13:07:37  12                    Focusing first on the simplification that will

13:07:42  13     result from a stay in light of the instituted '490 IPR

13:07:47  14     proceedings.  All of the asserted claims for the '490 are

13:07:51  15     being challenged in the IPR proceedings.  As a result, the

13:07:55  16     patent could be eliminated entirely from this action which

13:07:59  17     is important because not only are there nonparty inventors

13:08:02  18     for the '490 Patent that are not inventors for the other

13:08:06  19     asserted patents, but also the '490 technology relates to an

13:08:11  20     entirely different topic than the other three asserted

13:08:15  21     patents.  The '490 focuses on collimator optimization

13:08:20  22     whereas the other three asserted patents are not focused on

13:08:23  23     collimators at all.

13:08:25  24                    THE COURT:  But you want me to stay the entire

13:08:28  25     case, not just the case as to the '490 Patent; right?

13:08:31 1                MS. ALLEN:  Correct.  And I'm happy --

13:08:34 2                THE COURT:  How is telling me how the '490

13:08:38 3   Patent is so different going to help me -- help to convince

13:08:43 4   me to stay the entire case when a substantial number of

13:08:48 5   claims exist in the other patents?

13:08:52 6                MS. ALLEN:  Given Your Honor's question, why

13:08:54 7   don't I focus now on the asserted claims and the '283 and

13:08:58 8   '175 that are not subject to IPR proceedings.

13:09:04 9                THE COURT:  Okay.

13:09:05 10               MS. ALLEN:  So focusing on that, there is

13:09:07 11  substantial overlap between the '096 Patent for which IPR

13:09:12 12  proceedings have been instituted and the '283 and '175.

13:09:16 13  Your Honor heard lengthy argument this morning addressing

13:09:21 14  precisely that overlap which was acknowledged by BMI's

13:09:25 15  counsel during the claim construction argument.  That favors

13:09:29 16  a stay because the PTAB's analysis during the '096 IPR

13:09:34 17  proceedings are instructive and simplify the issues before

13:09:38 18  this Court as to the '283 and '175 Patents for which IPR

13:09:46 19  proceedings have not been instituted.

13:09:48 20               Let's focus first specifically on the overlap

13:09:52 21  between the '283 and the '096.  The '096 functionally

13:09:55 22  resembles a continuation in part of the earlier '283.

13:10:03 23  Between those two patents, there are four out of five of the

13:10:07 24  same inventors.  Both patents are directed to the use of a

13:10:11 25  computer implemented simulated annealing radiotherapy

13:10:16 1   planning algorithm to optimize a radiation beam arrangement.

13:10:21 2   There also are significant portions of the disclosures in

13:10:25 3   the two patents, specifications, and figures that are nearly

13:10:30 4   identical.  In fact, due to the substantial similarities

13:10:35 5   between these two patents, the '096 is now subject to

13:10:38 6   re-exam proceedings for statutory and obviousness type

13:10:42 7   double-patenting compared to the '283.

13:10:47 8          Now, turning to the '175, it is also not subject

13:10:52 9   to IPR proceedings.  That patent likewise incorporates the

13:10:56 10  '096 by reference in its entirety and the reason it does so

13:11:01 11  is to provide support and an explanation of what the '175

13:11:07 12  optimizer does.  Because of this substantial overlap between

13:11:13 13  the '096 for which IPR proceedings have been instituted,

13:11:20 14  ordering a stay in this case will allow the Court the

13:11:24 15  benefit of the PTAB's analysis in the '096 which will be

13:11:29 16  instructive as to the '283 and '175 as well.

13:11:32 17         Finally, even assuming the PTAB were to sustain

13:11:37 18  all of the challenge claims, a stay would simplify the

13:11:41 19  issues in this action and preserve the Court's resources

13:11:42 20  through not only providing the benefit of the PTAB's expert

13:11:42 21  analysis, but also narrowing Varian's prior art base

13:11:52 22  invalidity defenses via IPR estoppel.

13:11:57 23         THE COURT:  Would the narrowing of the prior

13:12:00 24  art, what patents would that apply to?

13:12:05 25         MS. ALLEN:  That would apply to the patents for

13:12:06 1    which IPRs have been instituted, namely the four --

13:12:11 2            THE COURT:  So just so I understand, and I

13:12:14 3    apologize for cutting you off, I think it's a product of us

13:12:17 4    being on the phone, so I'm sorry about that.  But what I'm

13:12:21 5    trying to understand is you just made the argument that the

13:12:24 6    '096 and the '283 Patents are very similar and have similar

13:12:29 7    claims, but as I am understanding you, you're saying but the

13:12:32 8    estoppel would only apply to the '096, and you could

13:12:37 9    essentially make the same prior art arguments that the PTAB

13:12:42 10   addressed with the '096, but you could make them for the

13:12:45 11   '283.  Is that your position?

13:12:48 12           MS. ALLEN:  Varian's position, of course, would

13:12:51 13   depend on -- well, the application of the estoppel will turn

13:12:57 14   on the -- what happens before the PTAB and the IPR

13:13:04 15   proceedings.  Varian's position is that as is clear under

13:13:09 16   Section 315(e)(2), estoppel only applies as to those patents

13:13:16 17   or claims for which IPR has been instituted.

13:13:20 18           THE COURT:  I understand that.  But you're

13:13:22 19   telling me that oh, even though not all the patents and even

13:13:27 20   though not all the claims are at issue, the case will be

13:13:33 21   simplified because of this estoppel.  I'm trying to

13:13:35 22   understand if that is really the case given that you're

13:13:39 23   essentially leaving open the fact that you could make the

13:13:42 24   same prior art arguments on the '283 Patent that you would

13:13:46 25   be estopped from making on the '096.  So I'm kind of missing

13:13:52 1    how there is really a simplification if that's really your

13:13:56 2    position.

13:13:57 3             MS. ALLEN:  There will be a simplification as to

13:14:00 4    two of the patents for which IPRs have been instituted.  And

13:14:04 5    that's the point as to IPR estoppel.

13:14:09 6             And even setting aside -- so the scope of the

13:14:14 7    IPR proceedings also will be limited to -- yes, I'll leave

13:14:19 8    it at that.

13:14:23 9             THE COURT:  Okay.  Anything else?

13:14:25 10            MS. ALLEN:  I'll turn now to the second factor,

13:14:29 11   the status of the litigation.

13:14:31 12            THE COURT:  And let me just caution you to watch

13:14:34 13   your time because there is still a motion to dismiss, so you

13:14:37 14   guys can decide how you want to use your time, but my guess

13:14:41 15   is you probably have about fifteen minutes left.

13:14:48 16            MS. ALLEN:  Then with that I will note that the

13:14:50 17   status of the litigation favors a stay here because the most

13:14:54 18   burdensome parts of the litigation remain ahead.

13:14:57 19            And the third factor likewise favors a stay

13:15:00 20   because there will be no undue prejudice to BMI nor give

13:15:02 21   Varian an unfair advantage particularly where here two of

13:15:02 22   the patents are expired and the parties are not direct

13:15:12 23   competitors.

13:15:14 24            Unless the Court has any other questions, I will

13:15:21 25   pass the argument to counsel for BMI.

13:15:25  1              THE COURT:  Okay.  Let me hear from Plaintiff.

13:15:28  2              MR. MADDOX:  Good afternoon, Your Honor.  Steven

13:15:31  3    Maddox for the Plaintiff.

13:15:34  4              Just a few points, I won't be very long at all,

13:15:37  5    arising from the reply brief that they filed.  In the reply,

13:15:51  6    basically they take math to a bunch of cases and say see,

13:15:57  7    it's not about the majority of claims and one case they cite

13:16:04  8    for the first time in their reply brief, that's the *Aquos*

13:16:08  9    case on page 8 of their reply.  And they come up with a

13:16:12 10    14 percent figure.  I'm not really sure.  The court never

13:16:16 11    came up with that, but anyway.  The point is that that case

13:16:20 12    turned for simplification on the patentee's expressed

13:16:24 13    admission that there was significant overlap in the claims

13:16:27 14    to be construed.  There was a similarity of invention

13:16:30 15    disclosure and the claims were to the same key inventive

13:16:34 16    aspect.  That's the patentee admitting that and the court

13:16:39 17    leaning on that and saying it will simplify what's before

13:16:42 18    the PTO.  We don't have that here.  What we're attempting to

13:16:46 19    suggest in our brief is -- first of all, we weren't saying

13:16:49 20    you're bound by a quantitative analysis.  We were saying

13:16:51 21    courts seem to be looking at quantitative analysis to make

13:16:54 22    this a little more objective, a little more literal as cases

13:17:01 23    evolve.  First they look at a number of claims that aren't

13:17:04 24    before the PTO compared to the portion of those who are.

13:17:05 25    They don't stop there.  They say well, listen, how similar

13:17:12  1    are these things?  And when the patents are in the same

13:17:15  2    family and have the same specification, they're going to

13:17:19  3    find that simplification is in favor.  And that's what they

13:17:24  4    found in the *Personal Webtext* case cited on page 9 of their

13:17:30  5    reply.  And it's also what they found in the *Iogen* case

13:17:36  6    cited on page 9 of their reply.  They sort of attempted to

13:17:39  7    make those cases impose a mathematical equation on those

13:17:43  8    cases, but those cases turn on the common sense that when

13:17:46  9    you have patents in the same family or when you have a

13:17:49  10   patentee that says yeah, they're the same, then you may have

13:17:54  11   some simplification going on.  Here we don't have that.  Is

13:17:58  12   there some similarity between the '096 and the '283

13:18:02  13   specification?  Yes, there is some.  Are the claims the

13:18:08  14   same?  No.  Have they identified any terms, any common claim

13:18:11  15   terms that are going to be construed by the PTO?  No.

13:18:15  16         I should point out as they have argued for the

13:18:18  17   wonderful guidance the PTO is going to give on claim

13:18:21  18   construction, we spent most of today arguing against what

13:18:24  19   the PTO did.  Also as you noted, Your Honor, the PTO

13:18:28  20   guidance to claim construction at least on this case has

13:18:31  21   been quite conclusory and not much use.  We don't think

13:18:36  22   there is any spillover helpfulness coming from these.  I

13:18:40  23   won't recite anything else in the brief.

13:18:42  24         There is some tussle in the reply about the

13:18:45  25   timing of this and there were contentions and so forth.  The

13:18:52  1    bottom line is we had midnight filings on the 365 date and

13:18:57  2    they wouldn't tell us what their obviousness combinations

13:19:02  3    were until they got their motion to stay on file.  There is

13:19:07  4    not much more I can say or inclined to use our time to do.

13:19:13  5            THE COURT:  Let me understand.  I thought I

13:19:14  6    heard from Varian's counsel that the parties are not

13:19:17  7    competitors.  I took it from the declarations that they were

13:19:22  8    competitors.

13:19:23  9            MR. MADDOX:  I was just about to turn to that if

13:19:26 10    I may.  On the competitive issue, we have a declaration of

13:19:31 11    Thomas Roden and, you know, all the declarations before you

13:19:36 12    obviously are obviously carefully written what they say and

13:19:39 13    don't say.  The bottom line is this, Best is in the

13:19:42 14    treatment planning systems business.  For a while they

13:19:45 15    worked with and Varian wanted to work with us because it

13:19:48 16    wanted to get the brains that we have to work with their

13:19:52 17    machines.  That eventually stopped.  Low and behold, Best --

13:19:57 18    I'm sorry, low and behold Varian started bundling a TPS with

13:20:03 19    its machines and the machines are in the market in which

13:20:06 20    they are quite dominant.  And meanwhile we went about still

13:20:11 21    trying to get people to take licenses to use our brains and

13:20:14 22    we're out there garnering 50 percent of the market using

13:20:18 23    what we say infringes our patent.  They're bundling the

13:20:21 24    brains we came up with along with their machines in which

13:20:24 25    they are a 900-pound gorilla.  We think that's competitive.

13:20:29  1        Do we have significant market share?  No.  If

13:20:32  2   market share is the test, then we don't have it.  But the

13:20:35  3   whole point is we can't be getting market share because

13:20:40  4   they're bundling frankly our own technology with a machine

13:20:45  5   in which they are, you know, the 400-pound gorilla.  So

13:20:50  6   that's what we say on competition.

13:20:52  7        Frankly we don't think it even needs to reach

13:20:55  8   competition.  There is no substantial simplification here.

13:20:59  9   There is no claim construction help that's coming.  But I

13:21:03 10   will leave it there unless you have further questions.

13:21:05 11        THE COURT:  One more question, Mr. Maddox.  That

13:21:08 12   is, what, if anything, am I to make -- you talked about sort

13:21:12 13   of what you thought were the Defendant's tactics.  What

13:21:16 14   about the point that was raised that, you know, Best waited

13:21:22 15   to file this suit and, you know, including so long that the

13:21:28 16   patents are -- two of the patents or a few of the patents

13:21:33 17   are now expired?

13:21:34 18        MR. MADDOX:  A couple of things.  First of all,

13:21:36 19   the patents that were expired are pioneering patents in the

13:21:40 20   field.  And then we have the subsequent patents that are

13:21:42 21   defined in the subsequent technology, the '283 to the '490

13:21:46 22   and other aspects of the brain of this.

13:21:50 23        Secondly, I must say I'm not familiar with the

13:21:52 24   exact language.  I see what you see from the complaint,

13:21:56 25   discussions in 2012, and I guess a lawsuit in 2000 -- I'm

13:22:00 1   sorry, '18.  Part of the dynamic here is frankly the client

13:22:07 2   is very small and funding to go up against a 900-pound

13:22:11 3   gorilla is substantial.  And I don't know why they chose to

13:22:16 4   sue when they sued, but I haven't seen a stay case that

13:22:22 5   actually considered that a factor and then granted a stay.

13:22:26 6   I have seen some cases where they talk about a preliminary

13:22:30 7   injunction, moving for that, but most of those get resolved

13:22:34 8   when they figure out who had access to the code when, which

13:22:38 9   is what we have, our situation.

13:22:39 10          So I guess I would say I don't know that that

13:22:44 11  alleged delay in bringing the case and I don't know what

13:22:47 12  happened between the parties between 2012 and the time it

13:22:50 13  was filed, I simply don't know, but I don't know that

13:22:54 14  someone pointing out that gap is a factor that any court has

13:22:58 15  really used to grant a stay.

13:23:00 16          THE COURT:  Okay.  Ms. Allen, I'll give you the

13:23:03 17  last word.

13:23:04 18          MS. ALLEN:  Thank you, Your Honor.  I will

13:23:07 19  respond briefly to the points made by BMI's counsel.

13:23:10 20          First, Varian completely disagrees with any

13:23:11 21  suggestion as was made today and is in BMI's papers that

13:23:18 22  Varian in some way delayed or has used this for a tactical

13:23:23 23  advantage.  Varian timely filed its IPR petitions and did so

13:23:26 24  within two months of receiving BMI's preliminary

13:23:32 25  infringement contentions, which were the first time BMI made

13:23:37 1   any effort to narrow the 82 asserted claims down to 37.  So

13:23:42 2   the timing of the filing of the IPR petitions was completely

13:23:47 3   reasonable.

13:23:48 4          In addition to that, Varian promptly moved to

13:23:51 5   stay within a couple of weeks of receiving the institution

13:23:54 6   decisions.

13:23:55 7          Turning next to the point of the suggestion that

13:23:59 8   BMI and Varian are direct competitors, the only thing in the

13:24:04 9   entire record to support that false claim is that a

13:24:09 10  self-serving statement in a declaration from BMI's

13:24:14 11  programmer IT manager who does not attest to having any

13:24:19 12  responsibilities or role related to sales or marketing.  By

13:24:23 13  contrast, Varian has submitted a third-party report showing

13:24:28 14  that the industry doesn't recognize BMI as a competitor in

13:24:31 15  the treatment planning space.

13:24:34 16         Finally, Your Honor is correctly right in

13:24:38 17  focusing on the fact that here two of the patents are

13:24:42 18  expired.  And as a result, even if you assume and take at

13:24:47 19  face value BMI's claim that it in some way competes with

13:24:52 20  Varian, the fact that seventy percent of the asserted claims

13:24:56 21  are in expired patents takes away any need or any undue

13:25:01 22  prejudice that would result to BMI as a result of a stay in

13:25:05 23  these proceedings since for seventy percent of those claims

13:25:08 24  they're only seeking monetary damages.

13:25:12 25         THE COURT:  And do you think the fact that it's

13:25:15 1    a small company and those monetary damages may be meaningful

13:25:19 2    weighs against a stay?

13:25:26 3            MS. ALLEN:  No.  The fact that should BMI

13:25:33 4    prevail, which, of course, Varian does not think it will,

13:25:37 5    will have the opportunity to have interest on those claims

13:25:40 6    which would adequately compensate BMI in the unlikely event

13:25:46 7    it were to prevail.

13:25:48 8            THE COURT:  Okay.  Thank you.  And I want to

13:25:51 9    thank the parties for the arguments.  They were helpful to

13:25:55 10    me.  But, after hearing the argument and reviewing the

13:25:58 11    briefing, I am going to exercise my discretion and deny the

13:26:02 12    motion to stay.

13:26:04 13            I have reached my decision by reviewing the

13:26:06 14    factors that the Court typically looks at in these

13:26:09 15    circumstances.

13:26:10 16            First, as to simplifying the issues, I do not

13:26:16 17    believe that the case would be substantially simplified by a

13:26:20 18    stay.  Although there may be some similarities between

13:26:23 19    claims being reviewed and claims not, it remains a fact that

13:26:27 20    sixteen of the twenty-two asserted claims in this court are

13:26:30 21    not subject to IPR.  And those claims will need to be

13:26:33 22    adjudicated regardless.

13:26:36 23            And, although record in the PTAB and statements

13:26:39 24    about the prior art that will become part of the intrinsic

13:26:42 25    record are sometimes informative, here, many of the asserted

claims are in patents that are not subject to IPR, and thus the proceedings will be of limited, if any, value.

So, in this case, we have rather minimal simplification even if all claims are determined to be invalid in the IPR.  And that weighs against a stay.

Next, the prejudice.  I have considered the four factors courts review in addressing undue prejudice and tactical disadvantage.

With respect to the timing of the request for review and the request for stay, Varian could have moved faster but it filed its request for review within the time allowed by statute and then moved relatively quickly in seeking a stay after the PTAB institution decisions.  I cannot conclude that Varian sought a clear tactical advantage in the timing of either its request for *inter partes* review or to stay.

With respect to the status of the IPR proceedings, the final IPR decision is expected to issue somewhere around three months before the close of expert discovery and around nine months before trial.  This allows time for addressing those decisions in this case to the extent we need to do so.  And, thus, that also weighs against a stay.

And, finally, the parties' relationship.  Despite Defendants' questioning of the competitor issue, I

13:28:20 1  find that the parties are competitors - and that weighs

13:28:24 2  against a stay.  Best has submitted declarations supporting

13:28:28 3  its claim that a stay will prejudice Best because Varian's

13:28:32 4  alleged infringing activity, along with its dominance in the

13:28:37 5  market, is causing loss of revenue and opportunity.  And

13:28:40 6  that is typically difficult for a small company.

13:28:43 7          Taking all of that together, I find that Best

13:28:45 8  may likely be tactically disadvantaged by a stay.

13:28:50 9          Finally, looking at whether discovery is

13:28:53 10 complete and a trial date is set.  Here, we have just

13:28:57 11 extended the trial date.  And many of the issues are in

13:29:00 12 relatively early stages.  Fact discovery is ongoing.  Expert

13:29:05 13 discovery does not begin for quite a while.  And the trial

13:29:11 14 is not set for quite some time.  So, when I consider the

13:29:18 15 status of this case, I think that this factor favors a stay.

13:29:23 16          But, when I weigh all the factors, I think it

13:29:27 17 tips in favor of not staying the case.  And, so, the motion

13:29:31 18 to stay is denied.

13:29:34 19          And that then will bring us to the motion to

13:29:40 20 dismiss.  So who is going to handle that one.

13:29:47 21          MR. MARTINEZ:  Good morning, Your Honor.  This

13:29:48 22 is Jose Martinez for the Defendant, Varian Medical Systems.

13:29:53 23          THE COURT:  Okay.

13:29:54 24          MR. MARTINEZ:  Thank you, Your Honor.  So the

13:29:58 25 last time the parties were before this Court, Your Honor

13:30:01 1   ruled that BMI had not plausibly alleged any indirect or

13:30:05 2   willful infringement claims.  That hasn't changed since we

13:30:10 3   were last before you.

13:30:12 4           Now, slide 2 summarizes the relief that Varian

13:30:16 5   is seeking today and why.  As an initial matter, I'll just

13:30:20 6   say quickly that BMI fails to plead any contributory

13:30:24 7   infringement since their own allegation shows that Varian's

13:30:28 8   products allow for substantial non-infringing use.  That

13:30:32 9   bars their contributory infringement claim as a matter of

13:30:35 10  law in its entirety.  And I'm not sure there is much more to

13:30:40 11  say on that particular point.

13:30:41 12          What Varian plans to focus on today is the

13:30:44 13  middle column that you see which is BMI's failure to plead

13:30:49 14  knowledge of infringement.  As this Court found in *DoDots*

13:30:52 15  that precludes all pre-complaint liability for willful and

13:30:57 16  indirect infringement.  Just as with Varian's first motion

13:31:01 17  to dismiss, BMI continues to dance around the

13:31:04 18  straightforward question which is why hasn't it just come

13:31:07 19  out and said that in 2012, BMI and Varian discussed these

13:31:11 20  asserted patents in relation to these accused products.

13:31:16 21  BMI's continuing failure to make that straightforward

13:31:20 22  factual allegation speaks volumes.

13:31:23 23          So if the Court has any specific questions, I'm

13:31:27 24  cognizant of my limited time and I'm happy to answer

13:31:30 25  anything the Court has, otherwise I can briefly talk about

13:31:33 1    BMI's failure to plead knowledge of infringement.

13:31:36 2              THE COURT:  Why don't you do that.

13:31:38 3              MR. MARTINEZ:  Thank you, Your Honor.

13:31:41 4              Turning to slide three, as this Court again

13:31:43 5    noted in *DoDots*, the law requires a non-conclusionary

13:31:49 6    plausible allegation of fact that Varian knew it was

13:31:52 7    infringing the asserted patents.  Thus far other than the 29

13:31:57 8    conclusionary allegations it makes in the first amended

13:32:00 9    complaint which we have catalogued on page 8 of our motion,

13:32:04 10   BMI has refused to provide one.

13:32:06 11             Now, we would submit that BMI can't plead that

13:32:09 12   Varian had knowledge of infringement because it's not true.

13:32:12 13   Now, Varian isn't asking the Court to make that factual

13:32:18 14   finding at this stage, but BMI's failure to make that

13:32:22 15   allegation is on its own a sufficient basis to dismiss.

13:32:25 16   This is exactly like the quote purposeful sidestep in the

13:32:29 17   Third Circuit *Caldon* case because BMI is refusing to plead

13:32:34 18   what it wants this Court to infer that Varian and BMI

13:32:37 19   discussed the asserted patents in relation to the accused

13:32:40 20   products in 2012.

13:32:41 21             Now, if that were true, surely BMI would have a

13:32:44 22   direct affirmative allegation in the complaint to that

13:32:48 23   effect and it doesn't.  And for that reason as the Third

13:32:52 24   Circuit found in *Caldon*, it's not good enough.  I think this

13:32:55 25   pleading failure matters for at least a few reasons.  The

13:32:59 1    first is BMI has to meet its pleading standard under Rule 12

13:33:04 2    and if it doesn't, then in *DoDots* this Court pointed to the

13:33:08 3    policy of pairing down claims by time period where

13:33:11 4    allegations are insufficiently pled.

13:33:14 5            More to the point, BMI was there in 2012.  BMI

13:33:19 6    has pled that they were there.  And that means they know

13:33:23 7    what BMI and Varian talked about and they know what they can

13:33:27 8    and cannot physically alleged.  These claims also matter

13:33:32 9    because they drastically expand the scope of discovery.

13:33:36 10   While Varian has produced or agreed to produce all of the

13:33:41 11   discovery to which BMI is entitled, these inadequately pled

13:33:45 12   claims implicate third parties including Varian's customers.

13:33:50 13   And the Supreme Court in *Twombly* identified the potential

13:33:54 14   enormous costs in discovery prevented defendants from

13:33:56 15   needlessly incurring those costs as one of the policy

13:34:00 16   reasons underlying Rule 12.

13:34:02 17           What BMI does do in the complaint is it resorts

13:34:05 18   to cryptic allegations and taken together those allegations

13:34:09 19   do not give rise to a plausible inference that Varian knew

13:34:12 20   it was infringing the asserted patents.  And these are the

13:34:12 21   allegations, Your Honor, in paragraphs 36 through 38, 40 and

13:34:20 22   43 of the first amended complaint.  And they center on

13:34:25 23   alleged communications between BMI and Varian between 2012

13:34:29 24   and they try to allege just enough to get the Court to draw

13:34:32 25   a favorable inference, but the allegations show that it's

not enough.

I think the most obvious example is that BMI doesn't ever say which patents or products the parties were allegedly actually talking about.  And you can see those admissions in paragraphs 36 through 38.  And then BMI alleges in paragraph 40 that the parties had a teleconference where they discuss the quote, Best patent portfolio, but the knowledge of a patent portfolio doesn't equal knowledge of the patent, let alone knowledge of infringement.

The last I'll point out is in paragraph 43, BMI alleges that Varian e-mailed BMI about exploring technology that quote, may be covered by the Best patent portfolio.  For one thing, this isn't a licensing negotiation like BMI says it is in paragraph 36.  And again, BMI still does not specify products or patents.

In sum, BMI does not give this Court a plausible basis on which to infer that Varian knew of its alleged infringement and accordingly fails to state a claim for induced, contributory, and willful infringement to the extent they're based on Varian's pre-suit conduct.

Just briefly, Your Honor, unless you have questions on that, I can quickly turn to the remainder of our argument.

THE COURT:  Okay.

13:36:01 1     MR. MARTINEZ: Thank you.

13:36:03 2    I think the briefing on the claims, on BMI's

13:36:06 3 claims regarding Varian's post complaint conduct is fairly

13:36:10 4 straightforward. As slide 4 shows, BMI hasn't pled

13:36:14 5 contributory infringement because their own allegations not

13:36:18 6 to mention the patents and the exhibits make clear that the

13:36:22 7 accused products have at least one major substantial

13:36:27 8 non-infringing use and the prior art radiation technique we

13:36:30 9 identified and that bars the claim in its entirely.

13:36:34 10    As you see on slide 5, induced infringement

13:36:38 11 failed in its entirety, too, because the only basis BMI has

13:36:41 12 for making that claim are Varian's marketing and training

13:36:44 13 materials. As the *Monect* court in this district pointed

13:36:49 14 out, that's not enough as a matter of law.

13:36:52 15    And I'll conclude here, Your Honor, on slide 6,

13:36:55 16 and we'll just say that, you know, with post complaint

13:36:58 17 willfulness, it's a closer call. In our motion we argue

13:37:01 18 that BMI's deficient allegations preclude pre-suit of

13:37:09 19 willful infringement. We think it's clearer now especially

13:37:12 20 in light of an order issued by Judge Connolly ten days ago

13:37:17 21 that the complaint itself can't be the source of the

13:37:19 22 knowledge required to sustain induced or willful

13:37:24 23 infringement claims. And I think we'll plan to revisit that

13:37:27 24 particular argument either at the 12(c) stage or on a motion

13:37:31 25 for summary judgment.

13:37:32  1          THE COURT:  I would suggest that you wait until

13:37:35  2     after you get some discovery and we deal with things like

13:37:42  3     that on summary judgment that we continue to have arguments

13:37:46  4     about the pleadings.

13:37:49  5          Let me hear from Plaintiff.

13:37:54  6          MR. MADDOX:  Yes.  Good afternoon, Your Honor.

13:37:56  7     Steven Maddox again for Plaintiff.  With respect to the

13:38:03  8     indirect infringement claims, let's start with knowledge of

13:38:06  9     infringement.  I'm sorry, any computer is doing that.  So

13:38:12 10     the big different between the complaint you dismissed and

13:38:17 11     the complaint that we filed or that was filed by our

13:38:22 12     predecessors in the first amended complaint essentially

13:38:24 13     comes to paragraph 35 through 63.  And the big chunk of

13:38:28 14     those dealing with facts and actually providing evidence

13:38:34 15     because we do allege that they had knowledge of each patent.

13:38:39 16     And, for instance, in paragraph 96 of the complaint, we say

13:38:45 17     as detailed in paragraphs 34 to 67, Defendants had knowledge

13:38:48 18     of the '283 Patent no later than January 2012.  And we go

13:38:54 19     back to those paragraphs, you see that it's talking about

13:38:58 20     January 2012.  And it seems that our statement saying you

13:39:02 21     had knowledge as of January 2012 and here is a bunch of

13:39:08 22     e-mails from 2012 is not specific enough for them, which

13:39:12 23     they don't really have any cases to support that.

13:39:16 24          We were told the first time that we were too

13:39:20 25     conclusory, so this time we came back with listen, here is

13:39:24 1    what the e-mails said, here are the facts, here are the

13:39:28 2    people, he was in charge of the Eclipse treatment, he said

13:39:32 3    we may be covered by the patent portfolio and in order to

13:39:35 4    determine this, I want the demonstration to figure this out.

13:39:39 5         We think that these facts, and they're not just

13:39:43 6    alleged facts, they're actual evidence, more than plausibly

13:39:48 7    allow us to infer that each of these patents were known and

13:39:54 8    there was knowledge of treatment for each of these patents

13:39:58 9    as alleged weren't conclusory in the counts.

13:40:02 10        Now, the crux of their complaint this time

13:40:07 11   essentially is well, look, that e-mail didn't say, didn't

13:40:12 12   list the patents, and unless it list the patents, you lose.

13:40:17 13   And they say that on page 9 of their opening brief, and

13:40:23 14   page 9, a direct quote from Varian is courts have required

13:40:28 15   allegations that the parties discussed these specific

13:40:30 16   patents being asserted, meaning unless you have got the

13:40:35 17   patent numbers, you don't have a basis to allege

13:40:39 18   contributory infringement.

13:40:40 19        The thing is when companies talk about

13:40:42 20   technology and wanting to take license and figuring out

13:40:42 21   whether they got a need for a license, they don't call up

13:40:42 22   and say I would like to talk to you about and then list a

13:40:52 23   number of patent numbers.  They say I want to talk to you

13:40:52 24   about the portfolio around this product or the portfolio

13:41:00 25   around that product.

By the way, in all of this, we can't possibly know what patents they're talking about.  You notice Varian doesn't say any other patent could have been, the document, the evidence itself, much less our allegation say this was being talked about by the Eclipse people, the Eclipse is the accused treatment planning system of Varian with Best after they had worked together for a number of years trying to make the treatment planning system Corbus talk to Varian's machinery, the LINAC, the accelerator.

But back to their statement that the courts require this, no, they don't.  Three cases they cite on page 9 are *Monect, Netgear* and *UMass v. Memorial*.  *Monect* found a plausible inference of knowledge because the defendant had identified the patents-in-suit to the PTO through prior art.  That's not a rule that says you have to list the patent by number.  *Netgear* found plausible inference where the plaintiff had taken a license to the asserted patent.  That's not a rule that says you have to list the patents by number.  *UMass v. Memorial,* it was a plausible inference because the defendant had cited it as prior art and had contacted about discussing a license.

None of these cases reflect knowledge, suggest, a rule that you have to identify the patents by name in our allegations to support a plausible inference of knowledge of infringement.

13:42:38  1          And finally, Varian went a little too far on

13:42:42  2  page 9.  They say nothing in the claim plausibly indicates

13:42:45  3  that any of the technologies discussed were related to the

13:42:48  4  asserted patents or accused products.  And, of course, right

13:42:51  5  there in e-mail it says Varian talked to my individual

13:42:56  6  there, he is in charge of the Eclipse treatment.  He is

13:43:00  7  that.  The only other thing to mention here is there is no

13:43:02  8  evidence or even an allegation that Varian had any interest

13:43:06  9  in any patents other than for TPS, for Best, it's the only

13:43:13 10  thing Best did.  They can't even say well, it could have

13:43:16 11  been about something else.  No.  There is a you were too

13:43:20 12  conclusory and now we say well, here is facts and evidence,

13:43:25 13  they say that evidence doesn't have the magic words in it.

13:43:29 14  This is going to be a factual issue, I suppose, a big

13:43:34 15  factual issue, but it's going to be that.  It's not going to

13:43:37 16  be something that should be resolved on pleadings.

13:43:42 17          I would like to talk for a second about

13:43:44 18  inducement and intent.  Counsel didn't spend any time on

13:43:48 19  that.  I will say their brief on page 15, they say that

13:43:50 20  *Monect* stands for the proposition that instructing customers

13:43:56 21  is insufficient for inducement.  *Monect* doesn't say that.

13:44:02 22  Again, *Monect* --

13:44:05 23          THE COURT:  But the problem, the issue I had

13:44:07 24  with the inducement, this aspect of inducement was that I

13:44:12 25  previously said that you hadn't pleaded, you kind of had

13:44:19 1    these generalities on they train people and tell people how

13:44:25 2    to use it, but there weren't any specifics given.   And for

13:44:29 3    three out of four patents no changes were made to those

13:44:31 4    allegations.   So I'm not sure how it's consistent with my

13:44:35 5    prior ruling to say well, Judge, change your mind, it's not

13:44:42 6    sufficient when you actually didn't add anything.

13:44:45 7               MR. MADDOX:   You are correct about the relative

13:44:49 8    text.   As you know, I am new counsel here.   I don't lightly

13:45:00 9    say it, but it seems to me that *UMass* say that those

13:45:05 10   allegations are enough and we alleged a bunch of manual -- I

13:45:09 11   must say I don't know every attachment to the first amended

13:45:13 12   complaint, but we gave all the documentation that we have on

13:45:16 13   it.   And if it doesn't include a user manual, I don't think

13:45:21 14   they have a user manual.   We couldn't go out and get user

13:45:27 15   manuals.   I don't have anything else for you on that, Judge.

13:45:32 16   I'm sorry.

13:45:35 17               THE COURT:   Okay.

13:45:39 18               MR. MADDOX:   But I would suggest that it's

13:45:42 19   legally sufficient to allege that they train their customers

13:45:44 20   to do that and they do that among other things through user

13:45:44 21   manuals and Varian doesn't seem really to dispute that.   It

13:45:55 22   doesn't seem to be an actual issue.

13:45:55 23               And in their reply on page 5 and page 16 of

13:45:59 24   their brief, their argument, the argument they start to

13:46:03 25   mount is if the user manual teaches a non-infringing use,

13:46:08 1    then we're out.  The main brief at 16 in the reply at five,

13:46:13 2    the thing is those folks who do have access to every user

13:46:17 3    manual that Varian ever made, those folks don't point to a

13:46:22 4    single page, to a single one of those manuals to show that

13:46:25 5    there was a non-infringing use.  They have the access to the

13:46:30 6    manuals.  They haven't come forward with any.  They just

13:46:34 7    said well, if there is a non-infringing use of the manual,

13:46:37 8    we're out.  They didn't follow that up with here is a

13:46:41 9    non-infringing use from our manual.

13:46:44 10          I would like to turn to contributory

13:46:46 11   infringement very briefly.

13:46:47 12          THE COURT:  I was just going to ask you, tell me

13:46:50 13   about this.  It seems to me that the case law says that what

13:46:53 14   you have asserted is sufficient unless it is undermined by

13:46:56 15   other aspects of the complaint and they seem to be saying

13:47:00 16   well, you know, you say that there is prior art that does

13:47:03 17   stuff, so therefore, it's undermined.  What's your response

13:47:06 18   to that?

13:47:06 19          MR. MADDOX:  There is always prior art that does

13:47:10 20   stuff.  They don't have anything other than a lawyer's

13:47:11 21   conclusionary assertion that it's undermined.  That would

13:47:17 22   very quickly lead to anything with prior art -- it doesn't

13:47:21 23   seem to be an argument that any court has ever bought and I

13:47:25 24   certainly haven't cited any.  What came out in their reply

13:47:28 25   for the first time is when they started -- they offer

13:47:32 1    essentially two cites to the exhibits of the first amended

13:47:36 2    complaint.  The first cite is to Exhibit R at docket

13:47:41 3    page 14, that's Document 44.4.  They say look, you see, it

13:47:46 4    says our linear accelerator, you can buy additional hardware

13:47:51 5    and attach it to our linear accelerator and that additional

13:47:55 6    hardware will let your linear accelerator do things that

13:47:59 7    they say here in this motion are not covered by the patents.

13:48:04 8    That's not enough to disprove anything or to show anything.

13:48:09 9    There is no indication of what the uses are, of who does it,

13:48:14 10   anyone has a motive to do it, if anyone ever does it.  These

13:48:17 11   are classic factual issues that shouldn't be resolved on the

13:48:22 12   complaint.

13:48:23 13            But one thing has come up.  When you look at

13:48:26 14   this more, if you look at the two things that they cited,

13:48:30 15   they are literature for their linear accelerator machine.

13:48:35 16   And that's the machine that actually does.  We are in the

13:48:41 17   brain business, the TPS business, and so what they basically

13:48:46 18   are saying is look, we bundle our TPS which we say

13:48:53 19   infringes, our TPS with our machine, and the machine that we

13:48:57 20   bundle our TPS with, that might be able to be used for

13:49:01 21   non-infringing uses, therefore, there could be no

13:49:02 22   contributory infringement.

13:49:02 23            And that takes you -- first of all, it's not

13:49:10 24   clear that that's enough, but it takes you into an

13:49:12 25   incredibly fact specific analysis that the Federal Circuit

13:49:16 1    has said in those cases you need to apply.  And it's not

13:49:20 2    briefed by anyone.  It came up in their reply.  But I would

13:49:25 3    recommend the Court to *Richo Company v. Quanta Computer*, 550

13:49:31 4    F3rd 1325 at 1338, Federal Circuit 2008.  When a

13:49:39 5    manufacturer includes in its product a component that can

13:49:42 6    only infringe, the inference of infringement as intended is

13:49:48 7    unavoidable.  It's entirely appropriate to presume that one

13:49:52 8    who sells a product containing a component that has no

13:49:55 9    substantial infringing use in that product does so with the

13:49:59 10   intent that that component will be used to infringe.  I'm

13:50:02 11   not saying this case means we win, I'm saying this case

13:50:06 12   means it's going to be a sticky factual issue if that's

13:50:09 13   their theory.  I bundled it to something that has a

13:50:15 14   substantial amount of non-infringing use.  We can sidestep

13:50:18 15   it here because of a non-infringing use is lawyer

13:50:23 16   conclusionary statements about some things in the back of

13:50:25 17   options for a sales brochure.  That's not the kind of

13:50:28 18   contradiction to overcome the presumption that your

13:50:32 19   allegation is sufficient to begin with.

13:50:34 20           With that, if you have a question, if you don't,

13:50:36 21   I'll pass it to the counsel.

13:50:39 22           THE COURT:  Okay.  Defendant.

13:50:40 23           MR. MARTINEZ:  Thank you, Your Honor.  Just a

13:50:42 24   few responses to what BMI counsel just noted.  The first is

13:50:51 25   that BMI is conflating knowledge of the patent with

13:50:55 1    knowledge of infringement.  BMI's counsel focused on how the

13:50:59 2    allegations of the complaint allow for the plausible

13:51:05 3    inference that Varian knew of the four asserted patents.

13:51:09 4    Notwithstanding the fact that we disagree with at least,

13:51:13 5    with respect to at least two of the asserted patents, that

13:51:16 6    doesn't matter for purposes of this motion.  What BMI had to

13:51:20 7    do, whether it had to plausibly allege that Varian knew of

13:51:24 8    its alleged infringement and our argument is that well,

13:51:29 9    given the vague allegations that BMI added to the complaint

13:51:34 10   in response to the Court's order dismissing their initial

13:51:37 11   complaint, those amended allegations even still don't get

13:51:41 12   there.

13:51:44 13           The second thing that I will point out is that

13:51:47 14   it is not our position that the patents need to be listed in

13:51:50 15   the e-mail that's attached to the complaint, to the amended

13:51:54 16   complaint as Exhibit S.  It is our position that BMI needs

13:51:58 17   to make that allegation in their complaint even on

13:52:02 18   information and belief, even just to say we believe that in

13:52:05 19   2012, based on what we know that Varian and BMI discussed

13:52:10 20   the asserted patents with respect to the accused products.

13:52:14 21   And again, even after their initial set of allegations were

13:52:18 22   dismissed, they did not do that.

13:52:22 23           The last point I'll make, Your Honor, is just

13:52:25 24   with respect to contributory infringement, I disagree with

13:52:30 25   counsel's characterization of Varian's argument so I will

13:52:34  1    just briefly summarize it here.

13:52:37  2              We are -- we do point out in the complaint first

13:52:42  3    -- excuse me, we pointed out in our brief that BMI has

13:52:46  4    alleged in paragraphs 23 and 24 of the complaint that

13:52:50  5    conformal radiation therapy is in the prior art and BMI

13:52:55  6    discusses the problems in the prior art purportedly solved

13:52:58  7    by the patents.  In the same complaint in paragraphs 112 and

13:53:02  8    176, BMI alleges that ellipse is used among other uses to

13:53:08  9    explain conformal radiation therapy treatment and thus

13:53:11 10    admits that the accused products have a substantial

13:53:16 11    non-infringing use that's identified as a prior art

13:53:20 12    technique in its own complaint.

13:53:22 13              And I would add that, you know, we identified a

13:53:26 14    few examples in BMI's exhibits to the complaint that support

13:53:32 15    that, but really, everything you need is on the face of

13:53:37 16    BMI's pleading and on the face of the patents that they're

13:53:40 17    asserting against us.

13:53:42 18              Unless the Court has any further questions, I'll

13:53:45 19    submit.

13:53:46 20              THE COURT:  Okay.  Thank you.

13:53:48 21              So Defendants have moved to dismiss the claims

13:53:52 22    of indirect infringement and pre-suit willful infringement

13:53:56 23    of the four patents-in-suit in Plaintiff's Amended Complaint

13:54:00 24    pursuant to Rule 12(b)(6).

13:54:02 25              I am going to grant the motion in part and deny

it in part.

As I noted in my prior decision on the motion to dismiss, the general law on pleading requirements and, in particular, pleading direct infringement and inducement is set out in my opinions in *DoDots Licensing Solutions LLC v. Lenovo Holding Co.*, No. 18-098(MN), 2018 WL 6629709 (D. Del. Dec. 19, 2018) and the subsequent opinion in that case at 2019 WL 3069773 (D. Del. July 12, 2019).

There are three types of infringement at issue in Defendants' motion to dismiss:

1.   Inducement;

2.   Contributory infringement; and

3.   Willful infringement.

First, as to Defendants' argument that Plaintiff has failed to plead pre-suit knowledge of the patents and knowledge of alleged infringement and, therefore, the indirect and willful infringement claims should be dismissed to the extent they are based on Defendants' pre-suit conduct.

To state a claim of indirect infringement or willful infringement, a plaintiff must plausibly allege that the accused infringer had knowledge of the patent and knowledge of its infringement - here, Plaintiff's allegations of knowledge are sufficient at this stage. Plaintiff alleges, *inter alia*, that the parties'

13:55:22  1    "representatives participated in a teleconference on

13:55:26  2    February 16, 2017, during which representatives of the

13:55:30  3    parties ... discussed ... the Best patent portfolio related

13:55:37  4    to the Corvus treatment planning system" and, as of that

13:55:41  5    same date, "each of the Patents-In-Suit was publicly known

13:55:44  6    as covering aspects of Corvus due at least to patent

13:55:49  7    marking."  Plaintiff further alleges that the two sides

13:55:53  8    communicated regarding the same patent portfolio and

13:55:56  9    Defendants' technology.

13:55:57 10           Additionally, Plaintiff alleges that Defendants'

13:56:00 11    knowledge of at least two of the Patents-In-Suit - the '283

13:56:04 12    and '096 Patents - is further evidenced by the fact that

13:56:07 13    those patents were cited eight and seven times,

13:56:09 14    respectively, as prior art in the prosecution of patents

13:56:11 15    assigned to Defendants.

13:56:14 16           I am mindful that Plaintiff is arguably pleading

13:56:19 17    around the issue - and did not specifically say that the

13:56:22 18    Patents-In-Suit were discussed.  But I think the pleading

13:56:24 19    here is different from *Caldon* because here they allege

13:56:31 20    talking about the patent portfolio and allege these patents

13:56:38 21    are part of that portfolio.  So I find that such allegations

13:56:42 22    are sufficient at this stage, where I must construe the

13:56:46 23    complaint in the light most favorable to Plaintiff, to

13:56:50 24    reasonably infer that Defendants knew of the Patents-In-Suit

13:56:54 25    pre-suit and had knowledge that the Accused Products

119

infringed the Patents-In-Suit.  I am not saying that they
have shown that for purposes that will get beyond summary
judgment, but I think they have done enough for the pleading
stage.  And, thus, I will deny Defendants' motion with
respect to that issue.

Next, Defendants argue that Plaintiff's pre- and
post-suit contributory infringement claims should be
dismissed because the Amended Complaint does not plead
sufficient facts indicating that the Accused Products lack a
substantial non-infringing use.

To state a claim for contributory infringement,
Plaintiff must allege, *inter alia*, that Defendants sold
products with no substantial non-infringing use.  "The
Federal Circuit[, however,] has ruled that affirmatively
pleading the absence of substantial non-infringing uses
renders the claim plausible if the pleadings do not
undermine that allegation."  That's the *Merck Sharp & Dohme
Corp. v. Teva Pharms. USA, Inc.* case, 2015 WL 4036951, at
*7, which cites the *Bill of Lading* case from the Federal
Circuit.  Non-infringing uses are substantial when they are
"not unusual, far-fetched, illusory, impractical,
occasional, aberrant, or experimental."  Id.

Plaintiff alleges that the Accused Products were
or are "not staple articles or commodities of commerce
suitable for substantial non-infringing use."  Defendants

contend that those allegations are undermined, however, because the '283 and '096 Patents "acknowledge that many conformal radiation treatment techniques existed in the prior art" and certain exhibits attached to the Amended Complaint indicate that the Accused Products are used with non-infringing conformal radiation techniques encompassed by that described prior art and, thus, they have substantial non-infringing use.

At this stage, however, it is not sufficiently clear to the Court that that is true.  The '283 and '096 Patents describe prior art methods of conformal radiation therapy, but both patents also state that the inventions they convey "relate[] to a method and apparatus for conformal radiation therapy of tumors."  Moreover, the purportedly non-infringing uses mentioned in the exhibits pointed to by Defendants do not clearly fall within the prior art methods distinguished in the patents, at least from my reading at this stage.

Thus, I cannot conclude that the conformal radiation therapy described in the exhibits pointed to by Defendants are any of the prior art techniques described in the '283 and '096 Patents and, in turn, that the Accused Products have substantial non-infringing use.

Although there may be a discrepancy between Plaintiff's Amended Complaint and its exhibits, the pleading

13:59:50 1  stage of this case is not the time to conclusively determine

13:59:53 2  that the uses of the Accused Products mentioned in the

13:59:56 3  exhibits which Defendants point out constitute substantial

14:00:01 4  non-infringing use, particularly so where I must assume the

14:00:08 5  veracity of the facts pled.

14:00:09 6      Lastly, Defendants argue that Plaintiff's

14:00:12 7  induced infringement claims should be dismissed because the

14:00:16 8  Amended Complaint "pleads no additional facts showing that

14:00:19 9  [Defendants] actively induced its customer to infringe the

14:00:21 10 asserted patents."

14:00:22 11     Plaintiff contends that it has met this

14:00:24 12 requirement because it has sufficiently alleged knowledge of

14:00:27 13 the patents and infringement, as well as marketing,

14:00:30 14 training, and promotional activities of the Accused Products

14:00:33 15 by Defendants for an infringing use.

14:00:36 16     "[M]arketing activities are ... sufficient to

14:00:39 17 constitute induced infringement ... [if] coupled with actual

14:00:43 18 knowledge of the patents-in-suit and awareness that the

14:00:46 19 accused products infringe the patent[s]-in-suit."

14:00:49 20     Yet, as I stated in dismissing Plaintiff's

14:00:52 21 original inducement claims, unsupported and conclusory

14:01:00 22 assertions for each patent that Defendants knowingly cause

14:01:01 23 or intend to cause direct infringement of the relevant

14:01:05 24 patent ... with specific intent and that Defendants train

14:01:08 25 their customers on the use of the Accused Products and/or

promotion, sales, and/or importation of the Accused Products with no reference to any actual promotional materials is not enough.

The Amended Complaint, for the most part, still lacks any reference to actual promotional materials or similar materials, or comparable specific factual allegations.  Instead, it once again - for the most part - improperly relies on unsupported conclusory allegations that are almost identical to those in the Original Complaint. The one exception is in relation to the '283 Patent, for which Plaintiff now asserts that "Varian provided Eclipse user guides and reference manuals allowing its customers to use the infringing features of Eclipse, including IMRT optimization."

Thus, I will grant Defendants' motion to dismiss Plaintiff's claims of induced infringement, both pre- and post-suit, for all of the Patents-In-Suit except the '283 Patent.  However, I will do so without prejudice.  To the extent that Plaintiff can uncover any specific documentation or evidence during the discovery period, it may later attempt to amend the complaint to add such allegation.

So, with that, Defendants' motion to dismiss is denied-in-part and granted-in-part.

Now I think we have addressed all of the issues that we had planned on addressing today.  Is there anything

14:02:41 1    else that we need to discuss now from Plaintiff?

14:02:47 2              MR. SON:   This is Anthony Son on behalf of the

14:02:53 3    Plaintiff.  I don't believe there are any additional issues.

14:02:57 4              THE COURT:   For the Defendant, anything else?

14:03:02 5              MR. LAM:   Your Honor, this is Lee Lam for

14:03:04 6    Defendant, Varian.  I take it that we are now at the

14:03:09 7    pleading stage and that we will have to answer in due

14:03:15 8    course.  I take that as the upshot of Your Honor's oral

14:03:19 9    ruling on our motion to dismiss.

14:03:22 10             THE COURT:   Yes.  I am not telling the Plaintiff

14:03:24 11   to file an amended, potential amended pleading within a

14:03:30 12   particular time frame given that I think some discovery

14:03:34 13   needs to play out.  So yes, I think we are at the point

14:03:38 14   where the Defendant needs to answer.

14:03:46 15             Anything else?  All right, everybody.  I hope

14:03:52 16   you have a good weekend and I thank you again for your

14:03:54 17   arguments here today.

18             (Teleconference concluded at 2:03 p.m.)

19

20             I hereby certify the foregoing is a true and
              accurate transcript from my stenographic notes in the proceeding.

21

22                          /s/ Dale C. Hawkins
                            Official Court Reporter
23                            U.S. District Court

24

25